Justice LaVECCHIA delivered the opinion of the Court.
This appeal involves the validity of the warrantless search of the bedroom of defendant, Byseem Coles, a young adult, nine days shy of twenty years old when the events pertinent to this appeal *327 occurred. Defendant lived with other family members in his aunt’s home in Camden where he had his own bedroom. The bedroom door had a padlock on it to keep others, especially young children living in the household, from getting into his private belongings.
On the evening of March 18, 2008, when defendant was walking in the neighborhood in which he lived, he was detained by a police officer investigating a reported robbery in the area. After a showup in which the robbery victim failed to identify defendant as the perpetrator, and after a search of defendant’s person that produced no evidence linking defendant to the crime, defendant’s detention was continued because he had no identifying documents on his person. At defendant’s urging, two officers walked a few houses over from where defendant was being held in a patrol car to ask one of defendant’s relatives to confirm that he lived at the address he had given the police. Instead of merely confirming defendant’s identity and that he lived in the home, the inquiries by the police turned into a concerted effort to obtain defendant’s aunt’s permission to search defendant’s bedroom. During the ensuing search, weapons unrelated to the robbery under investigation were found in his room.
We conclude that defendant’s detention was unlawful. The police lacked probable cause to continue his detention after the showup and the search of defendant produced no evidence linking him to the crime. Although the police officers were entitled to a reasonable, but brief, opportunity to confirm defendant’s identity, that identification was accomplished at the threshold of defendant’s home. When the police efforts turned immediately thereafter to securing from defendant’s aunt consent to search defendant’s bedroom, their actions were premised on the belief that the man held in the patrol car was Byseem Coles. However, at that point, defendant’s detention ceased to be lawful. The interactions with defendant’s aunt cannot be disentangled from the unlawful detention of defendant in a patrol car parked a few houses down the street. Thus, the objective reasonableness of this asserted *328 consent-based search founders on the unlawfulness of the police detention of defendant in the totality of these circumstances.
Accordingly, under the totality of these circumstances, we hold that the warrantless search of defendant’s bedroom was not objectively reasonable, and we base that holding on the protection provided by Article I, Paragraph 7 of the New Jersey Constitution against unreasonable searches of one’s home and personal living space. See State v. Evers, 175 N.J. 355, 384, 815 A.2d 432 (2003) (granting privacy interests in home “the highest degree of respect and protection in the framework of our constitutional system”).
Although our decision is based on state constitutional law, our holding is bolstered by Fourth Amendment principles. Federal case law supports the conclusion that a warrantless consent-based search is objectively unreasonable and unconstitutional when premised on defendant’s illegal detention. See Fernandez v. California, 571 U.S. -,-, 134 S.Ct. 1126, 1134, 188 L.Ed.2d 25, 35 (2014).
I.
A.
The facts as summarized are based on the testimony from the hearing conducted by the suppression court. Differences between what the officer learned at the scene and the information elicited at the suppression hearing are highlighted.
At 11:34 p.m. on May 18, 2009, Sergeant Zsakhiem James of the Camden City Police Department responded to a report of a robbery in Camden. The dispatcher informed James that a “male had just robbed a female in the area of the 1100 block of Lakeshore Drive” and described the perpetrator as a “black male wearing black pants and a gray hooded sweatshirt.” James testified that there was “information that [the perpetrator] used a weapon,” which James believed to be a handgun.
*329 According to James, he arrived at the location within “minutes” and began driving from the 1100 block, where the crime took place, toward the 1300 block. James saw defendant, who matched the description of the robber, walking in James’s direction on the street where the crime took place; in other words, defendant was walking toward his home, which was situated between defendant and the officer’s approaching vehicle. James exited his vehicle, approached defendant, and engaged him in conversation. James testified that he detained defendant because he gave suspicious answers to questioning about where he was coming from[1] and because defendant appeared “nervous” and “fidgety.” James conducted a Terry[2] frisk and called for a backup unit because a police dog occupied the back of his K-9 vehicle and he had no other place in which to secure defendant. The patdown of defendant revealed no weapons or any evidence of the robbery. Nevertheless, defendant was placed in the back seat of the backup unit that had arrived.
James then asked defendant where he lived. Defendant replied that he lived at 1287 Lakeshore Drive, the block on which he had been walking; however, he was unable to produce identification to prove it. He told the officers that there were relatives at home with whom he lived — an aunt and a cousin — who could identify him.
At that point, the victim of the robbery arrived for a showup identification and defendant was removed from the police vehicle. The victim was unable to identify defendant as the perpetrator after viewing his face because, she said, “the robber had a mask on.” Based on defendant’s outfit — the ubiquitous black pants and grey hooded sweatshirt of many young urban males — the victim added that defendant’s clothes matched the clothes the robber had worn.
*330 The officers returned defendant to the back seat of the patrol car. James, along with a detective, walked six houses down the street to the residence at which defendant claimed to reside. A woman who identified herself as Thelma Coles, the homeowner, answered their knock on the door. ' James explained that the officers were investigating a robbery. He told Ms. Coles that they “had a young man in ... custody who[ ] identified himself as Byseem Coles and stated that he lived there.” They asked her “if she had any identification for him.” She replied that the officers could not have her nephew because she had “just heard him inside ... his room moving and banging around.” However, after having another family member cheek the bedroom while the officers waited at the threshold, she learned that he was not home.
B.
According to James, he then wanted to view defendant’s room himself because he believed that defendant had stopped home after committing the robbery and that evidence of the crime might be discovered in the bedroom. He repeatedly asked Ms. Coles for permission to view the room. Although other family members urged her not to agree, Ms. Coles ultimately agreed to let in only James.
She directed him to the bedroom at the top of the stairs leading from the front door. Once there, James observed a locked padlock hanging from the door, although the door was ajar a few inches. Other doors on the floor were also fitted with padlocks. He asked Ms. Coles if she had a key to the padlock on defendant’s bedroom door and learned that she did. He also learned that a padlock was on defendant’s bedroom door, as well as others, to keep others, especially younger children in the house, from touching or rummaging through other people’s belongings that were kept in their bedrooms. James’s questioning of Ms. Coles persisted at the bedroom doorway and he extracted from Ms. Coles that *331 she had slept in defendant’s bedroom recently. No other questions were asked of Ms. Coles at the time.[3]
Concluding that she had authority to consent to a search of the room, James began a methodic search that included looking in first one, and then a second, duffle bag sitting on the floor of the bedroom’s closet in order, as he explained it, to look for the victim’s purse or a handgun hidden under the bags in the closet. After picking up the first zippered-closed bag, James opened it because he thought he felt the stock of a shotgun in it. Discovering a shotgun in the first bag, he opened the second duffle bag that had been underneath and that had fallen to the ground with a loud thud. He found a rifle in that bag. The remainder of the search involved looking under a floor vent, opening a safe in the room, and going through closed drawers. Two more rifles were found below the floor vent. Ammunition for unrelated weapons was found in the safe and in a bag in a dresser drawer. The ammunition found in the safe is not part of the suppression motion before us.
C.
On August 13, 2009, a Camden County grand jury indicted defendant on three counts of third-degree unlawful possession of a weapon, N.J.S.A. 2C:39 — 5(c)(1); third-degree unlawful possession of a sawed-off shotgun, N.J.S.A. 2C:39 — 3(b); fourth-degree unlaw *332 fill possession of a defaced firearm, N.J.S.A. 2C:39-9(e); fourth-degree unlawful possession of a large capacity ammunition magazine, N.J.S.A. 2C:39 — 3(j); and second-degree certain persons not to possess weapons, N.J.S.A 2C:39-7(b). Defendant filed a motion to suppress the evidence found in his bedroom. After hearing testimony and argument, the motion court denied the application in a written opinion.
The motion court first dispensed with the legitimacy of defendant’s detention, finding that the police had reasonable suspicion to conduct a Terry stop and patdown search when defendant matched the sex and race description, and wore clothing fitting the description reported by the victim; gave “incongruous answers”; and was “fidgety” and “nervous” when describing his whereabouts. The court concluded that defendant’s detention was valid.
Next, the court concluded that Ms. Coles had authority to consent to a search of defendant’s bedroom. The court found that she and defendant “share[d] control of the space” because she occasionally slept in the room. Although there was a padlock on the door, Ms. Coles had a key to that lock and to those on the other doors, which had been installed prior to the time defendant moved into the home to keep younger children from accessing other persons’ rooms. Those facts, along with the informal nature of the rental arrangement between defendant and Ms. Coles, which was brought out in the hearing but not during the exchange between James and Ms. Coles at the time of the search, persuaded the court that defendant had no reasonable expectation of privacy in the room. With respect to whether Sergeant James could have reasonably believed that Ms. Coles had apparent authority over the bedroom, the court found that James held a reasonable belief that she could consent to the search because James had no way to know at the time of the search if defendant paid rent; Ms. Coles had told him that she had accessed defendant’s room in the recent past to sleep there; Ms. Coles consented in writing to the search; and she showed James to the bedroom door, which was ajar.
*333 Turning to the voluntariness of Ms. Coles’s consent, the court considered the impact of Sergeant James’s statement, testified to by Ms. Coles and not disputed by James, that he did not have a search warrant but “could get one.” Noting that it was arguably a coercive statement, the court determined that consent was voluntarily given, relying on its findings that James told Ms. Coles that she could refuse consent, that she signed a consent form, and that she acknowledged at the suppression hearing that she saw no reason why she should not consent to the search.
Finally, the court dispensed with arguments that the search exceeded the permissible scope authorized by Ms. Coles. Those arguments are not pertinent to our analysis and therefore will not be examined in detail.[4]
Defendant pleaded guilty to the charge of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b), in exchange for dismissal of the remaining charges. The court sentenced defendant to a five-year prison term with five years of parole ineligibility. Defendant also was sentenced to a three-year prison term for a violation of probation charge, which was made to run concurrent with the sentence on the certain-persons offense.
D.
In an unpublished decision dated April 11, 2012, the Appellate Division reversed the denial of defendant’s motion to suppress. The panel analyzed the motion with a focus on whether the third-party consent search was legitimate and determined that defen *334 dant’s “aunt did not have common authority over his bedroom, and therefore could not consent to the search.” The panel also concluded that “the failure of the police to ask defendant for his consent — especially when defendant was nearby and was being held in police custody under circumstances that were, at best, questionable — rendered the ensuing search unlawful.” The panel explained that courts assess the “reasonableness of the search in the totality of the circumstances, and must avoid applying” exceptions to the warrant requirement “in a vacuum.”
According to the panel, Ms. Coles did not have common actual authority to consent to the search because, even if Ms. Coles accessed defendant’s room for “ ‘limited purposes,’ that ... does not give [her] authority to consent to a search.” The panel stated that although Ms. Coles occasionally slept in defendant’s bedroom and had a key to it, her familial and landlord status did not give her authority to consent to a search of defendant’s bedroom. The panel determined that the motion court erred in its reliance on State v. Crumb, 307 N.J.Super. 204, 243-46, 704 A.2d 952 (App.Div.1997), certif. denied, 153 N.J. 215, 708 A.2d 66 (1998), which involved a different familial relationship between the parties, a different rental arrangement between those parties, and a room with only an unhinged door to provide privacy. Here, the panel determined that the motion court erred in concluding that defendant was not a tenant in his aunt’s home, where this almost twenty-year-old nephew paid his aunt $250 per month in board, which the police could have discovered by inquiring. Although defendant was not always required to pay rent or risk eviction, the panel was not persuaded that the informality of the rental agreement authorized defendant’s landlady to consent to a search of his room under State v. Coyle, 119 N.J. 194, 217, 574 A.2d 951 (1990).
In addressing the overall unreasonableness of the search, the panel noted that the police ignored “the very person with the superior right to control access to the room” — defendant—who was in police custody six houses away. Instead, without explanation, the police decided to obtain consent from Ms. Coles. The *335 panel stated that the conduct of the police leading up to the search was of “questionable validity” because reasonable suspicion to continue to detain defendant had likely “evaporated” when the victim was unable to identify him as the perpetrator. Citing Georgia v. Randolph, 547 U.S. 103, 121, 126 S.Ct. 1515, 1527, 164 L.Ed.2d 208, 226-27 (2006), the panel concluded that “defendant’s continued detention” in those questionable circumstances contravened federal precedent. Using a totality-of-the-circumstances assessment, the panel held the search to be unreasonable, reversed the suppression order of the trial court and defendant’s conviction, and remanded for entry of an order suppressing the evidence and further proceedings.
We granted the State’s petition for certification. State v. Coles, 212 N.J. 432, 54 A.3d 811 (2012).
II.
A.
The State seeks reversal of the Appellate Division’s decision. The State contends that Ms. Coles possessed sufficient common authority over defendant’s bedroom to consent to a search of the room. The State’s argument in that respect is based on Ms. Coles’s status as defendant’s aunt, the fact that she had recently slept in the room, and that she had a key to the padlock mounted on the door. Further, the State maintains that, based on the totality of the circumstances, Sergeant James’s belief that Ms. Coles possessed common authority over the room was reasonable and that the search therefore was justified.
The State further argues that defendant’s detention was proper and based on reasonable suspicion. Accordingly, it maintains that the third-party consent search was legitimate because defendant was not present at the scene and objecting to the search. The State relies on Randolph, supra, 547 U.S. at 121-22, 126 S.Ct. at 1527, 164 L.Ed.2d at 226-27, as well as the more recent decision in Fernandez, supra, 571 U.S. at -, 134 S.Ct. at 1133-34, 188 *336 L.Ed.2d at 34, to support that contention. Finally, the State disputes that Ms. Coles’s consent was not knowing, voluntary, and intelligent at all stages of the search.
B.
Defendant argues that the appellate panel’s decision should be affirmed because his aunt had neither actual nor apparent authority to consent to a search of his bedroom. He asserts that he was a tenant and that he maintained exclusive control over his room.
He also contends that his detention was improper. He argues that Sergeant James lacked reasonable suspicion when the detention began and that after the victim did not identify him there was no probable cause to continue his detention. Therefore, the subsequent search of his room was impermissible under Randolph because the police knowingly kept defendant detained in the patrol car to avoid the possibility that he would refuse to consent to the search. Finally, defendant argues that Ms. Coles’s consent to the search was not voluntary but rather was the result of police coercion.
C.
The American Civil Liberties Union of New Jersey (ACLU), appearing as amicus curiae, urges this Court to affirm the appellate panel’s decision. The ACLU submits that a landlord-tenant relationship existed in this ease; that Ms. Coles’s limited access to the room did not alter the basic assumption that defendant maintained a reasonable expectation of privacy when he occupied his room; and that Ms. Coles’s familial role as defendant’s aunt does not and should not alter that assumption. Accordingly, Ms. Coles did not possess common authority to consent to a search of defendant’s room. Further, the ACLU contends that police should not be permitted to utilize selective questioning techniques to avoid obtaining information that would undercut the appearance of common authority. Finally, the ACLU argues that, even if Ms. *337 Coles had the authority to consent to the search, the scope of that authority did not extend to secured containers within the room.
III.
A.
The New Jersey and Federal Constitutions guarantee the rights of persons to be free from unreasonable searches and seizures. N.J. Const. art. I, It 7; U.S. Const. amend. IV. The Fourth Amendment and the New Jersey Constitution assure the “highest degree of protection to privacy interests within the home.” State v. Johnson, 193 N.J. 528, 532, 940 A.2d 1185 (2008). Both protect against unreasonable searches and regard the warrantless entry into a person’s home as “presumptively unreasonable.” Id. at 552, 940 A.2d 1185 (internal quotation marks omitted); Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980).
To sustain the validity of a warrantless search, the State must demonstrate that the search fits within an accepted exception to the warrant requirement, one of which is the long-recognized consent-to-search exception. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854, 858 (1973); State v. Domicz, 188 N.J. 285, 305, 907 A.2d 395 (2006).
B.
In a series of decisions dating back forty years, the United States Supreme Court has addressed the right of police officers to conduct warrantless searches of homes based on consent given by a third party. See United States v. Matlock, 415 U.S. 164, 171-72, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249-50 (1974) (affirming warrantless entry and search by police officers who obtained consent of person possessing common authority over premises searched); Illinois v. Rodriguez, 497 U.S. 177, 185-89, 110 S.Ct. 2793, 2800-02, 111 L.Ed.2d 148, 159-61 (1990) (affirming search by police *338 based on consent granted by person whom police reasonably believed possessed common authority over premises to be searched). In consent-based searches, the State bears the burden of proving that proper consent was given freely and voluntarily. Schneckloth, supra, 412 U.S. at 223, 93 S.Ct. at 2045-6, 36 L.Ed.2d at 860-61; State v. Johnson, 68 N.J. 349, 354, 346 A.2d 66 (1975).
The United States Supreme Court has relied on the test of objective reasonableness in third-party consent searches. It was the underpinning of the apparent authority holding in Rodriguez, supra. See 497 U.S. at 185-86, 110 S.Ct. at 2799-2800, 111 L.Ed.2d at 159-60. There, the actions of the police were overtly tested by that standard when consent was granted by a third party in the absence of the defendant against whom the evidence seized would be used in a criminal trial. Ibid.
Moreover, the United States Supreme Court has held that, when faced with the circumstances of a present and objecting cooeeupant, it is objectively unreasonable for police to rely on the consenting occupant. In Randolph, supra, the Court’s majority opinion, written by Justice Souter, held that the physically present co-occupant’s stated refusal to permit entry prevails. 547 U.S. at 122-23, 126 S.Ct. at 1528, 164 L.Ed.2d at 227.
In Randolph, a wife had returned to the home she shared with her husband, after she had been staying with her family for several months. Id. at 106, 126 S.Ct. at 1519, 164 L.Ed.2d at 217. She called the police to the home when her husband took their child away after a dispute erupted between the couple. Id. at 107, 126 S.Ct. at 1519, 164 L.Ed.2d at 217. When the police arrived, she told them that her husband was a drug user and volunteered that there was evidence of that in the house. Ibid. The husband was present during this exchange and refused to grant the officers permission to search the home. Ibid. After the police searched the home pursuant to the wife’s consent, the defendant moved to suppress the evidence seized during the search. The Supreme Court of Georgia sustained a reversal of an initial order of *339 suppression and the United States Supreme Court affirmed the suppression of the seized evidence. The Supreme Court majority held that a warrantless search of shared dwelling space over the clear refusal of consent by a physically present resident is not reasonable, and required suppression of evidence that was seized on the basis of consent provided by another resident. Id. at 120, 126 S.Ct. at 1526, 164 L.Ed.2d at 226.
The Randolph majority also addressed two “loose ends” from its prior decisions in Matlock and Rodriguez. Id. at 120-21, 126 S.Ct. at 1527, 164 L.Ed.2d at 226. First, the Court explained that Matlock’s recognition of a co-tenant’s right to admit the police arises from the role that customary social usage bears in assessing the reasonableness of a search under the Fourth Amendment. Ibid. The Randolph majority stated that the right to admit arises not from “property right” considerations but rather from customary social understanding of whether there is a right to admit “powerful enough to prevail over the co-tenant’s objection.” Ibid. Second, the Court’s majority opinion noted that fine factual nuances distinguished Matlock and Rodriguez from Randolph and acknowledged the “fine line” it was drawing:
If a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant’s permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed, the potentially objecting tenant from the entrance for the sake of avoiding a possible objection [the search may be deemed objectively reasonable].
[Id. at 121, 126 S.Ct. at 1527, 164 L.Ed.2d at 226-27 (emphasis added).]
While emphasizing a disinclination to turn every co-tenant consent case into an examination into police efforts to locate a potential objector, the Court cautioned that police cannot make a defendant unavailable for the sake of avoiding a possible objection. See id. at 121-22, 126 S.Ct. at 1527-28, 164 L.Ed.2d at 226-27. That noted exception was the subject of attention in the Court’s most recent opinion in this line of cases.
*340 In Fernandez, supra, the Court reaffirmed the “touchstone” of objective reasonableness. 571 U.S. at -, 134 S.Ct. at 1132, 188 L.Ed.2d at 32. Fernandez also clarified that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason, ratifying that Randolph’s holding otherwise requires the presence of the objecting occupant. Id. at -, 134 S.Ct. at 1134, 188 L.Ed.2d at 35. We take from Fernandez two things: (1) that the objective-reasonableness test prevails; and (2) that police responsibility for the unlawful detention or removal of a tenant who was prevented from being present at the scene to voice his or her objection to the search is not equivalent to other neutral circumstances causing the defendant’s absence.
C.
Our state law on consent searches similarly has recognized a third party’s ability to consent to a search when the consenter has common authority for most purposes over the searched space. See State v. Suazo, 133 N.J. 315, 319-20, 627 A.2d 1074 (1993) (noting Matlock and Rodriguez upholding, under federal and state constitutions, third-party consent rendering warrantless search of premises objectively reasonable). As we have explained, police officers need not ultimately be factually correct about a party’s ability to consent to a search. Id. at 320, 627 A.2d 1074. The question is “whether the officer’s belief that the third party had the authority to consent was objectively reasonable in view of the facts and circumstances known at the time of the search.” Ibid.; see also Crumb, supra, 307 N.J.Super. at 243, 704 A.2d 952 (upholding, as objectively reasonable, officer’s warrantless search of adult son’s bedroom in mother’s trailer home based on mother’s consent where bedroom lacked hinged door and thus provided no expectation of privacy).
The appellate panel in Crumb, supra, noted that appellate decisions from our state generally have aligned with “the overwhelming majority of [jurisdictions] in holding that a parent has *341 the right to consent to the search of the property of his or her son or daughter.” 307 N.J.Super. at 243, 704 A.2d 952. In assessing the objective reasonableness in a circumstance involving an adult child living with parents, the Crumb panel discussed factors to consider when determining whether a child has exclusive possession of his or her room, such as whether the child pays rent;[5] whether the parent has access to the child’s room for cleaning or other such general access purposes; and whether the child has the right to lock the door to deny access. Id. at 245, 704 A.2d 952.
Ultimately, under our state law, the question remains one of objective reasonableness based on an assessment of the totality of the circumstances.
IV.
We thus turn to assess the objective reasonableness of the circumstances leading to the search of defendant’s bedroom. That assessment necessarily begins with review of the seizure of defendant’s person.
A.
The suppression court determined that Sergeant James had reasonable suspicion to stop and briefly detain defendant, explaining its reasoning as follows:
The determination of the legality of the detention that followed the questioning of Defendant requires a review of the totality of the circumstances. Here, the totality of the circumstances includes: 1) the fact that Defendant was wearing practically identical clothing to that of the robbery suspect (as confirmed by the robbery victim); 2) the incongruous answers Defendant gave regarding where he had been and where he was going (and, more precisely, Sgt. James’s knowledge, *342 based on his familiarity with the area, that the answers were factually suspect); and 3) Defendant’s “fidgety” and “nervous” conduct as he spoke with Sgt. James, an 18-year Camden police veteran.
The Appellate Division had no quarrel with the initial stop by James, who was investigating a reported armed robbery in the neighborhood in which he encountered defendant, but the panel’s review of the circumstances of the continued investigatory detention of defendant after the victim was unable to identify defendant as her assailant led it to conclude that the continued detention may have been unreasonable. We note at the outset that the Appellate Division’s review was itself conducted “with substantial deference to the trial court’s factual findings, which [it] ‘must uphold ... so long as those findings are supported by sufficient credible evidence in the record.’ ” State v. Hinton, 216 N.J. 211, 228, 78 A.3d 553 (2013) (omission in original) (quoting State v. Handy, 206 N.J. 39, 44, 18 A.3d 179 (2011)). However, a reviewing court owes no deference to the trial court’s determinations as to matters of law, and those determinations are reviewed de novo. State v. Buckley, 216 N.J. 249, 260-61, 78 A.3d 958 (2013); State v. Schubert, 212 N.J. 295, 304, 53 A.3d 1210 (2012).
Those standards also govern our review of the legality of defendant’s detention.
B.
A warrantless seizure of a person is “ ‘presumptively invalid as contrary to the United States and the New Jersey Constitutions’ ” unless that warrantless seizure “ ‘falls within one of the few well-delineated exceptions to the warrant requirement.’ ” State v. Mann, 203 N.J. 328, 337-38, 2 A.3d 379 (2010) (quoting State v. Pineiro, 181 N.J. 13, 19, 853 A.2d 887 (2004), and State v. Elders, 192 N.J. 224, 246, 927 A.2d 1250 (2007), respectively). An investigatory stop of a person — sometimes referred to as a Terry stop— is one such exception. State v. Rodriguez, 172 N.J. 117, 126-27, 796 A.2d 857 (2002).
*343 It is undisputed that a police officer may conduct an investigatory stop of a person if that officer has “particularized suspicion based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing.” State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986) (internal quotation marks omitted); accord Mann, supra, 203 N.J. at 338, 2 A.3d 379. The stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, the officer’s subjective good faith, or a mere hunch. See State v. Shaw, 213 N.J. 398, 411, 64 A.3d 499 (2012); Rodriguez, supra, 172 N.J. at 127, 796 A.2d 857.
There is a recognized constitutional balance to be struck between individual freedom from police interference and the legitimate and reasonable needs of law enforcement. See Davis, supra, 104 N.J. at 502, 517 A.2d 859 (noting that “Article I, paragraph 7 of the New Jersey Constitution ‘does not speak in absolute terms but strikes a balance between the interests of the individual in being free of police interference and the interests of society in effective law enforcement’ ” (quoting State v. Dilley, 49 N.J. 460, 468, 231 A.2d 353 (1967))); see also State v. Arthur, 149 N.J. 1, 7, 691 A.2d 808 (1997) (noting police conduct may be “assessed by ‘balancing the need to search (or seize) against the invasion which the search (or seizure) entails’ ” (quoting Terry, supra, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905)). That balance is critical because both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee to New Jersey’s citizens “[t]he right to walk freely on the streets of a city without fear of an arbitrary arrest.” State v. Gibson, — N.J.-,-, — A.3d-,-(2014) (slip op. at 8). When evaluating the reasonableness of a detention, the “totality of circumstances surrounding the police-citizen encounter” must be considered. State v. Privott, 203 N.J. 16, 25, 999 A.2d 415 (2010) (quoting Davis, supra, 104 N.J. at 504, 517 A.2d 859).
Case law has recognized law enforcement’s need to respond to the fluidity of a street encounter where there is a *344 reasonable suspicion of wrongdoing; accordingly, the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes. See, e.g., State v. Sloane, 193 N.J. 423, 426, 939 A.2d 796 (2008) (upholding officer’s decision to search NCIC database during traffic stop because that decision “did not unreasonably prolong the stop”); State v. Herrera, 187 N.J. 493, 504, 902 A.2d 177 (2006) (upholding investigatory stop). The reasonableness of a continued detention is determined through application of a two-pronged inquiry. First, the detention must have been reasonable at its inception. See State v. Dickey, 152 N.J. 468, 476, 706 A.2d 180 (1998); Davis, supra, 104 N.J. at 504, 507, 517 A.2d 859. Second, the scope of the continued detention must bé reasonably related to the justification for the initial interference. Dickey, supra, 152 N.J. at 476, 706 A.2d 180. Thus, the detention must be reasonable both at its inception and throughout its entire execution. See ibid.; United States v. Sharpe, 470 U.S. 675, 682-83, 105 S.Ct. 1568, 1573-74, 84 L.Ed.2d 605, 613 (1985). Further, the officer must use the least intrusive means necessary to effectuate the purpose of the investigative detention, Davis, supra, 104 N.J. at 504, 517 A.2d 859, and the detention must “last no longer than is necessary to effectuate the purpose of the stop,” Shaw, supra, 213 N.J. at 411, 64 A.3d 499 (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983)).
Our Court has recognized that “[tjhere is [no] litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop”; instead, when the duration of the detention is at issue, the proper question is “whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.” Dickey, supra, 152 N.J. at 476-77, 706 A.2d 180 (second alteration in original) (internal quotation marks omitted); see also State v. Baum, 199 N.J. 407, 425, 972 A.2d 1127 (2009) (stating continued detention beyond time needed to effectuate purpose of investigative detention constituted de facto arrest).
*345 c.
In the matter at hand, we agree with the trial court and the Appellate Division that Sergeant James’s initial stop and detention of defendant was reasonable. We have no quarrel with James’s patdown of defendant or his detention of defendant to enable a showup identification to be conducted. However, once the victim of the reported armed robbery arrived for a showup and was unable to identify defendant as the perpetrator, the calculus changed.
In assessing the reasonableness of a detention’s duration, we have upheld a police officer’s short-term detention of a suspect for the purpose of conducting a showup identification. See, e.g., State v. Henderson, 208 N.J. 208, 259, 27 A.3d 872 (2011) (noting “[s]howups often occur at the scene of a crime soon after its commission”); State v. Romero, 191 N.J. 59, 78, 922 A.2d 693 (2007) (upholding showup identification conducted during investigative detention). Such a brief investigative detention serves the beneficial purpose of quickly exonerating innocent suspects. See Romero, supra, 191 N.J. at 78, 922 A.2d 693; Herrera, supra, 187 N.J. at 504, 902 A.2d 177 (acknowledging showup identifications may “tend to avoid or minimize inconvenience and embarrassment to the innocent”). In that respect, it is a trade-off. By detaining an individual for whom probable cause to arrest is lacking in order that a showup might take place, the person exonerated by the showup is able to be on his or her way without the delay and inconvenience of being brought to headquarters and being required to submit to a line-up. See Herrera, supra, 187 N.J. at 504, 902 A.2d 177 (discussing utility of showup identifications). In other words, the exonerated person is not to be subjected to further detention.
A continued detention must conform to the constitutional requirement of the reasonableness standard that governs all investigative stops. If an officer’s conduct is unnecessarily intrusive or if the suspect is detained for a period beyond what can be considered reasonable, a de facto arrest occurs. See Dickey, *346 supra, 152 N.J. at 478, 706 A.2d 180. Once a de facto arrest occurs, the particularized suspicion that originally supported the investigative detention is no longer sufficient and the arrest must be supported by probable cause. See Gibson, supra, — N.J. at -, - A.3d at - (slip op. at 8) (“A person cannot be arrested unless there is probable cause to believe that he has committed or is committing an offense.”). An arrest unsupported by probable cause constitutes an “unreasonable seizure in violation of both the Federal and State Constitutions.” Ibid.
Here, defendant was prevented from going on his way after the showup failed to develop probable cause to arrest him.[6] James continued to detain defendant because defendant did not have any identification documents on him to prove that he was Byseem Coles and that he lived where he said that he did. While individuals are not required to carry identifying documents on them at all times in our free country, we accept that law enforcement acting under reasonable suspicion of an individual can expend a brief but reasonable period of time to confirm an individual’s identity in circumstances as presented here. Our case law has recognized a reasonable and brief interlude of time to permit such identifications to take place. See, e.g., Handy, supra, 206 N.J. at 47, 18 A.3d 179 (finding no quarrel with officer’s extension of investigatory stop of suspect to ascertain identity); Sloane, supra, 193 N.J. at 437, 939 A.2d 796 (finding officer’s running of NCIC check and driver’s license check reasonable during traffic stop); State v. Nishina, 175 N.J. 502, 513, 816 A.2d 153 (2003) (holding officer “was justified in continuing to question defendant,” including asking for identification).
Therefore, we allow that Sergeant James had the flexibility to seek confirmation of defendant’s identity, as defendant had suggested to James, from defendant’s relatives who were reportedly *347 at his nearby home. We further do not propose to hamstring the police officers’ on-the-scene determination to keep defendant detained in the patrol car while two officers approached the door of the home to which defendant directed them. Where we do part ways with the reasonableness of the police officers’ conduct is with what transpired at the doorway.
At the threshold to the home, in an exchange ■with defendant’s aunt, the officers dropped their suspicion of whether defendant was who he said he was — Byseem Coles. Their actions demonstrated that they had confirmed his identity and that he lived there because they commenced a concerted course of action to secure defendant’s aunt’s permission to let them search his bedroom. However, in accepting those beliefs as to defendant’s identity and residence, the officers no longer had sufficient legal reason to continue his detention. At that point, defendant’s continued police detention was no longer lawful.
The upshot of that alteration in the legality of the police detention of defendant is that the State cannot claim that James secured a valid consent to search defendant’s room from his aunt. The validity of this consent-premised search turns on the objective reasonableness of the police conduct based on the totality of the circumstances.
As the United States Supreme Court’s Fernandez opinion makes clear, valid third-party consent is subject to the exception that the third party’s consent cannot be manufactured through the unlawful detention of the defendant. That is what occurred here. Defendant was being unlawfully detained the moment the last vestige of a valid, continued investigatory detention had been resolved through confirmation of his identity and residence. At that point, he was entitled to be released. But, he was not. Rather, his detention continued while an officer questioned his aunt and obtained her consent rather than defendant’s to the search of his bedroom. The objective reasonableness of this asserted consent-based search ends with our conclusion that de *348 fendant was being unlawfully detained by police, a few houses away from his home, as soon as the officers at the doorway of his home transferred their focus from securing confirmation of defendant’s identity to securing unilateral consent from defendant’s aunt for the search of defendant’s room.
We need not address whether defendant’s aunt’s authority, standing alone, was sufficient to grant the officers access to the private bedroom of this young adult male living, as so many people do, in an extended-family living arrangement. We note only that, in such settings, personal privacy rights are not easily assessed through any uniform set of questions. We decline to parse the thoroughness of the officer’s questioning of the aunt, and his judgment based on her on-the-scene answers because, in the totality of these circumstances, this asserted consent-based search went off the rails of objective reasonableness once the officer began to secure consent from her. The officer’s action detaining defendant in a patrol car when probable cause to arrest was lacking effectively prevented any objection from defendant. It also prevented him from disputing his aunt’s statements in response to police inquiries about control over the room.
We conclude that the objective reasonableness of this asserted consent-based search founders on the unlawfulness of the police detention of defendant in the totality of these circumstances. See Suazo, supra, 133 N.J. at 320, 627 A.2d 1074 (adopting test of objective reasonableness based on totality of circumstances for asserted third-party consent searches of homes). Under the totality of these circumstances, we hold that the warrantless search of defendant’s bedroom was not objectively reasonable, and we base our holding on the protection provided by Article I, Paragraph 7 of the New Jersey Constitution against unreasonable searches of one’s home and personal living space. See Evers, supra, 175 N.J. at 384, 815 A.2d 432 (granting privacy interests in home “the highest degree of respect and protection in the framework of our constitutional system”).
*349 Although our decision is based on state constitutional law, our holding is bolstered by Fourth Amendment principles. Federal case law also supports the conclusion that a warrantless consent-based search is objectively unreasonable and unconstitutional when premised on a defendant’s illegal detention. See Fernandez, supra, 571 U.S. at -, 134 S.Ct. at 1134, 188 L.Ed.2d at 35.
Y.
The judgment of the Appellate Division is affirmed as modified by this opinion.

 Defendant told James that he was coming from a takeout restaurant several blocks away where, he said, he had purchased a soda.

 Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 Later, at the suppression hearing, Ms. Coles elaborated on her statement. She testified that she had slept in defendant's bedroom a couple of months earlier when her father, for personal reasons, had stayed in her home for several weeks. On that occasion, defendant had stayed with his mother for those weeks to make room for the extra family member. Ms. Coles emphasized that, although she used the bedroom for sleeping purposes, she did not disturb defendant's belongings other than to watch the television located in his room. That detail concerning Ms. Coles's use of the room, and other information regarding arrangements about defendant's payment of rent, was not known to James at the time of the search. Once James learned that Ms. Coles had slept in the room, he did not ask any other questions to probe the nature of her authority over the room.

 The court found that, although third-party consent does not authorize a search inside another person's private belongings unless those items are in plain view, James immediately recognized the feel of a shotgun inside the duffle bag in the closet when he was searching for the stated objects of his search, namely evidence of the robbery. After the initial finding of the shotgun, the court explained that James saw a rifle and magazine clip in the second unzipped bag that fell to the floor when he had moved the first bag. The court found that the community-caretaking exception to the warrant requirement justified a search of the remainder of defendant's bedroom.

 In a parent-child or other familial relationship, depending on the age of the child and the relationship, the typical rules governing a landlord’s inability to consent to the search of a tenant’s rented premises do not translate with crystalline clarity. See State v. Scrotsky, 39 N.J. 410, 415, 189 A.2d 23 (1963). Even the typical landlord, who may have a right to access the tenant’s room for specific "limited purposes,” does not by virtue of such authority have the ability to consent to a search. Coyle, supra, 119 N.J. at 216, 574 A.2d 951.

 At oral argument the State acknowledged that it lacked probable cause to arrest defendant after the showup did not result in defendant’s identification as the perpetrator of the armed robbery under investigation.