**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0679-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JERMY B. PORTILLO,

    Defendant-Appellant.

_____

Argued May 21, 2018 — Decided June 11, 2018

Before Judges Ostrer and Rose.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-09-0805.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the brief).

PER CURIAM

A jury found defendant Jermy B. Portillo guilty of two counts of first-degree robbery, N.J.S.A. 2C:15-1; one count of second-degree robbery, ibid.; third-degree receiving stolen property, N.J.S.A. 2C:20-7; third-degree possession of a weapon, a knife, for an unlawful purpose, N.J.S.A. 2C:39-4(d); and fourth-degree unlawful possession of a weapon, the knife, N.J.S.A. 2C:39-5(d). The convictions arise out of Portillo's knife-point robbery of two pedestrians and his robbery of a third victim, as the three stood outside a friend's house in Elizabeth. Portillo was accompanied by five others, including one who swung a machete in the air near the victims. After merger, the court sentenced defendant to two ten-year prison terms for the first-degree robbery counts, and a five-year prison term for the second-degree robbery count, to run consecutively, for an aggregate term of twenty-five years. Under the No Early Release Act, defendant must serve eighty-five percent of the sentence before parole eligibility. N.J.S.A. 2C:43-7.2.

Portillo presents three issues in his appeal from his conviction and sentence. He argues the court erred in denying his suppression motion, which challenged law enforcement's motor vehicle stop that led to his identification by the victims, and the recovery of weapons and stolen items. He also contends it was plain error to permit the prosecutor to state in summation that thirty seconds was sufficient for the victims to identify him and

that this error warrants reversal. Portillo also argues the consecutive sentences were inappropriate, and the aggregate term manifestly excessive. We reject defendant's arguments and affirm.

I.

The principal issue on appeal is defendant's challenge to the police stop. According to the sole witness at the suppression hearing, Elizabeth patrol officer Michael Nicolas, police received a dispatch fifteen minutes before midnight on November 15, 2010, that a group of "six Hispanic males dressed in black sweatshirts or hooded sweatshirts" had participated in a robbery at Washington and Grove. At 1:26 a.m., Nicolas and his partner, while in a marked police car, spied a three-row passenger van parked on the 300-block of High Street. Nicolas saw an Hispanic-looking man standing outside the van, later identified as D.V., a juvenile. Nicolas observed multiple people inside the van. Although he did not initially get a firm count, he could see they all wore dark clothing, some in dark sweatshirts. The driver — who, he later learned, was Portillo — appeared to be Hispanic.

They were less than a mile from the robbery scene. There was no other pedestrian or vehicular traffic. Nicolas said it was unusual for anyone to be out in the High Street neighborhood at that hour of the night.

A-0679-16T3

Nicolas's partner drove slowly as they closely passed the van, and then executed a U-turn. D.V. starting walking down the block at a "concerned pace." He seemed nervous. He was carrying what appeared to be a dark piece of clothing. The officers then activated their vehicle's overhead lights as they pulled behind the van.

Nicolas approached the passenger side and his partner approached the driver's side. At that point, Nicolas counted six men in the vehicle. All appeared Hispanic, and all wore dark clothing. D.V. then reappeared and the officers detained him. As police removed the van's occupants to prepare for the victims' show-up identification, police noticed a black jacket on the seat. Later found to belong to a victim, Nicolas removed it, to make sure it was free of weapons. A victim's debit card fell out.

The victims positively identified Portillo as the knife-wielding robber, and D.V. as the possessor of the machete. The victims also testified at trial that they recognized the van as the vehicle they saw circle before the robbery. Police found a knife and a machete in the area where D.V. had walked, before he returned to the van.

In denying defendant's suppression motion, Judge Joseph P. Donohue found Nicolas to be credible and believable. After

4

recounting the facts as generally set forth above, Judge Donohue stated:

> I'm satisfied that the officers had a reasonable, articulable suspicion. The timing of this event 40 minutes after the robbery, the fact that six individuals, that there were multiple individuals, that they . . . appeared to be Hispanic, that they were in the general location in which this occurred, the officer's testimony was that there [were] not too many people out that night . . . the location and the descriptions were close enough that they believed that they may have taken part in the robbery.

The judge found the police were entitled to clear the vehicle, and to detain the suspects for identification.

## II.

As point I in his appeal, defendant argues:

> SEEING SOME HISPANIC MEN ABOUT A MILE FROM THE SCENE OF A ROBBERY IS NOT REASONABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP.

Noting that the Census identified roughly sixty percent of Elizabeth's residents as Hispanic or Latino, defendant contends the police lacked a sufficiently detailed description of the robbers to justify stopping the van and its occupants.

On a motion to suppress, we deferentially review the trial court's fact-findings. State v. Elders, 192 N.J. 224, 243-44 (2007). Yet, defendant does not challenge the trial court's fact-finding. Also, the State concedes that the police stopped

defendant once they activated their overhead lights. The issue is whether the facts, such as they are, justified the stop. We review that legal issue de novo. State v. Watts, 223 N.J. 503, 516 (2015).

Police may conduct a warrantless, investigatory stop of a vehicle and its occupants if they have an objectively reasonable, particularized, and articulable suspicion of criminal activity. See, e.g., State v. Davis, 104 N.J. 490, 505 (1986). "Common sense and good judgment . . . require that police officers be allowed to engage in some investigative street encounters without probable cause." Ibid. Yet, the stop must be based on more than a "police officer's subjective hunch." Ibid. We consider the "totality of the circumstances," ibid., including inferences that a trained law enforcement officer makes, which may elude others. Id. at 501. "Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate . . . ." State v. Nishina, 175 N.J. 502, 511 (2003). The court "balanc[es] the State's interest in effective law enforcement against the individual's right to be free from unwarranted and/or overbearing police intrusions." Davis, 104 N.J. at 504.

"No mathematical formula exists" for determining reasonable suspicion. Id. at 505. However, certain principles are evident

A-0679-16T3

from our caselaw. A "non-particularized racial description of the person sought" is not enough to justify a stop. State v. Shaw, 213 N.J. 398, 411, 421 (2012) (stating police lacked requisite level of suspicion to detain man based on "the most generic description . . . [of] a black male"); State v. Maryland, 167 N.J. 471, 485 (2001) (stating that "an investigatory stop predicated solely on race would be . . . defective"); State v. Caldwell, 158 N.J. 452, 460 (1999) (suppressing evidence from a stop based on tip from informant that an individual described merely as "'black male in front of 86 Butler Street'" was engaged in criminal activity).

Yet, a racial description, coupled with other particularized facts, may suffice. In State v. Coles, 218 N.J. 322, 328 (2014), a robber was described as a black male wearing black pants and a gray hooded sweatshirt who used a weapon. The Supreme Court upheld the initial stop of a man who met that description two blocks from the crime scene within minutes of the robbery. Id. at 329, 345. Police were also justified in prolonging the stop to ascertain the suspect's identity after he appeared nervous and gave implausible answers to questions. Id. at 329, 345-46. Notably, the Court found it reasonable to detain the individual for a show-up, by which he would be on his way if exonerated. Id. at 345. Similarly, in State v. Todd, 355 N.J. Super. 132, 136-38 (App. Div. 2002),

we sustained a stop of a burglary suspect who matched the general description of a man of average height and weight in light-colored clothing. The man was reported running from the scene and the suspect was found within a few blocks, soon after the crime. Id. at 138. He was visibly nervous and sweating, and he gave implausible answers to an officer's questions. Id. at 136, 138.

Were the stop in this case based solely on a crime victim's non-particularized description of an Hispanic male in an Hispanic-Latino majority city, the stop unquestionably would have been defective. However, in stopping to investigate, the police relied on much more in forming a reasonable, particularized and articulable suspicion that Portillo and his cohorts had engaged in criminal activity.

The police did not stop a single man matching a racial or ethnic description. They were looking for a group of six persons, all male, all of the same ethnic group, all wearing the same dark clothing. Statistically speaking, coming across such a grouping, even where the majority of the community is Hispanic-Latino, is much less likely than finding a single person matching that description. Although Nicolas did not specifically count six such individuals before executing the stop, he identified a group of men, all with matching clothing, two matching the specified ethnic group, and none of a non-matching group. See United States v.

Arthur, 764 F.3d 92, 98 (1st Cir. 2014) (noting that the number of suspects was an acceptable factor in finding reasonable suspicion).

Furthermore, police came upon the van within forty-five minutes of the robbery, within a relatively short distance from the crime scene. See Coles, 218 N.J. at 329, 345; Todd, 355 N.J. Super. at 138 (stating that proximity in time and distance to crime are factors in forming reasonable suspicion). The van was also conspicuously out of place. Nicolas testified that pedestrian and vehicular traffic on High Street was unusual in the early morning hour when the stop occurred. See State v. Valentine, 134 N.J. 536, 547 (1994) (noting significance of a defendant's activity that was "entirely inconsistent with time of day"). D.V. also acted nervously, walking off at a "concerned pace" while carrying clothing that matched the victims' description. See Elders, 192 N.J. at 250 (stating that nervousness may be considered in determining whether reasonable suspicion exists); State v. Pineiro, 181 N.J. 13, 26 (2004) (stating that flight "in combination with other circumstances . . . may support reasonable and articulable suspicion").

Notably, the initial investigation — to ascertain the precise number of occupants, and whether they all matched the description the victims provided — was destined to be exceedingly brief. It

required a stop only long enough to enable the officers to approach the vehicle, and identify the occupants' gender, number, clothing, and ethnic background. Balancing the needs of law enforcement against the nature of the intrusion, the initial stop was reasonable. And when the police confirmed a match with the victims' description, along with the other circumstances, they were justified in prolonging the stop, and removing the occupants to await a show-up identification.

In sum, we discern no error in the trial court's order denying the motion to suppress.

III.

As his second point, defendant contends:

> THE PROSECUTOR'S MISSTATEMENT OF THE LAW SURROUNDING EYEWITNESS IDENTIFICATIONS CONFUSED THE JURY AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTION. (Not raised below).

Defendant takes issue with the prosecutor's argument that thirty seconds was sufficient time to enable the victims to identify Portillo. We are unpersuaded.

The prosecutor responded to the defense argument that the victims lacked sufficient time to make the show up identification. Defense counsel argued: "Thirty to 60 seconds to view each individual, ten to 15 feet away. Thirty to 60 seconds to view each individual that — who were ten to 15 feet away. At night

10

with spotlights, 30 to 60 seconds." In her summation, the prosecutor stood silent while she allowed thirty seconds to elapse and then argued, "The 30 seconds is up. Ladies and gentlemen, 30 seconds is more than enough time to be able to look at somebody, stare at them . . . remember their face an hour later, remember their face five years later. It's more than enough time."

The prosecutor did not mislead the jury, nor did the prosecutor purport to instruct the jury, as to the relevant and appropriate factors in assessing an identification. The court correctly instructed the jury in that regard, adhering to the post-Henderson model instruction. See State v. Henderson, 208 N.J. 208 (2011); Model Jury Charge (Criminal), "Out-of-Court Identification Only" (2012). The prosecutor appropriately responded to defense counsel's arguments. State v. Bradshaw, 392 N.J. Super. 425, 437 (App. Div. 2007), aff'd on other grounds, 195 N.J. 493 (2008); State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000). We discern nothing improper in the prosecutor's argument. As a result, it fell far short of the egregious prosecutorial misconduct that deprives a defendant of a fair trial. See State v. Frost, 158 N.J. 76, 83-84 (1999).

A-0679-16T3

IV.

Lastly, defendant challenges his twenty-five-year aggregate sentence, consisting of three consecutive terms for each of the three robbery counts, involving three separate victims. He argues:

> CONSECUTIVE SENTENCES WERE INAPPROPRIATE FOR THIS SINGLE ROBBERY INCIDENT, AND THE TWENTY-FIVE YEAR SENTENCE IS MANIFESTLY EXCESSIVE. (Not Raised Below).

Although the robberies occurred during one episode, they involved discrete threats. According to the evidence at trial, Portillo pressed a knife against the ribcage of one victim, as he demanded that he empty his pockets. When another victim took back his property from one of Portillo's cohorts, who was unarmed, Portillo went over to that victim, placed the knife against his ribcage, and demanded that he surrender his belongings. The jury found that Portillo did not threaten the third victim with the knife.

Noting that this was Portillo's first conviction, the court found that aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"), was in equipoise with mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) ("[t]he defendant has no history of prior

A-0679-16T3

delinquency or criminal activity").[1]  The court imposed sentences at the bottom of the range for each robbery count.  However, the court ordered that the terms be served consecutively.

We are satisfied that the court correctly applied the guidelines for imposing consecutive terms under State v. Yarbough, 100 N.J. 627 (1985), as amended by N.J.S.A. 2C:44-5(a).  See State v. Cassady, 198 N.J. 165, 182 (2009).  The court implicitly recognized that the robberies were related and close in time.  See Yarbough, 100 N.J. at 644 (citing as factors in considering consecutive terms whether the "crimes and their objectives were predominantly independent of each other" and whether "the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior").  In imposing consecutive terms, the court principally relied on the fact that the crimes involved three separate victims.  Ibid. (citing as a factor in considering consecutive sentences whether "any of the crimes involved multiple victims").  Furthermore, as to two victims, Portillo engaged in separate and discrete criminal acts.  Ibid.

---

[1] At one point, the judge misspoke and referred to aggravating factor seven and mitigating factor nine.  That mistake was repeated in the judgment of conviction.

A-0679-16T3

(citing as a factor whether "the crime involved separate acts of violence or threats of violence").

Consecutive sentences for multiple victims in multiple counts are consistent with the oft-stated principle that "there can be no free crimes in a system for which the punishment shall fit the crime." Id. at 643; see also State v. Carey, 168 N.J. 413, 429-30 (2001) (stating, in context of vehicular homicide cases, "the multiple-victims factor is entitled to great weight and should ordinarily result in the imposition of at least two consecutive terms when multiple deaths or serious bodily injuries have been inflicted upon multiple victims"); State v. Molina, 168 N.J. 436, 442 (2001) (approving consecutive sentences in vehicular homicide case where the only Yarbough factor supporting consecutive sentences is the presence of multiple victims, stating "crimes involving multiple victims represent an especially suitable circumstance for the imposition of consecutive sentences").

We also discern no merit to defendant's reliance on Miller v. Alabama, 567 U.S. 460 (2012) and State v. Zuber, 227 N.J. 422 (2017), addressing considerations applicable to sentencing juveniles. Portillo was not a juvenile. He committed the robberies when he was eighteen years old.

Given our deferential standard of review, see Cassady, 198 N.J. at 180, we discern no abuse of discretion, departure from

14

sentencing guidelines, or sentence that shocks the judicial conscience and warrants correction.

We therefore affirm the conviction and sentence, but remand for correction of the judgment of conviction to reflect the aggravating and mitigating factors as found by the court. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION