**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5071-13T1
              A-1056-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CARL J. HOLDREN,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

VALDO THOMPSON,

    Defendant-Appellant.

_____

Submitted April 4, 2017 — Decided  September 1, 2017

Before Judges Messano, Espinosa and Suter.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Indictment No.
07-09-0125.

Joseph E. Krakora, Public Defender, attorney for appellant Carl Holdren (Michele A. Adubato, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Valdo Thompson (Suzannah Brown, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondents (Daniel I. Bornstein, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendants appeal from their convictions and sentences for murder, attempted murder and other offenses arising from gang-related shootings. The charges were the culmination of an investigation by the New Jersey State Police (NJSP) into gang activity named Operation Dawg Pound. The evidence of defendants' guilt, which included telephone conversations intercepted pursuant to court order that dovetailed with surveillance and the seizure of evidence, was compelling. We have consolidated their appeals and now affirm.

I.

In November and December 2006, Detective Sergeant Jeffrey Burke of the NJSP was the lead detective in Operation Dawg Pound. NJSP's Street Gang Unit North had been conducting electronic surveillance for several months of Anthony Carter a/k/a Born, the OG, or "Original Gangster," of the Sex Money Murder (SMM) set of

the United Bloods Nation (Bloods) in New Jersey. Burke, who was qualified as an expert in gang terminology, gang culture and gang dynamics, explained that a set is "a subgroup that falls underneath the Bloods" street gang. The two other top sets under the Bloods umbrella were: G-Shine and the Brims. In the end of 2006, SMM "was at war or beefing with G-Shine and Brims."

Burke explained the hierarchy of the Bloods street gang. The highest ranking member of a Bloods set is an "OG." Below that, there are generals ranking from five star to one star, captain, lieutenant, sergeant and the lowest rank, "foot soldiers."

During the course of the investigation, a person known as "SB" showed up on a number of Carter's calls. Following his review of those calls, Burke surmised that SB, or "Soldier Boy," had a leadership role with SMM in Monmouth and Ocean Counties. SB was identified as defendant Valdo Thompson. An order was obtained that authorized electronic surveillance of Thompson's phone on November 22, 2006. Burke was able to determine that Thompson was a four star general, and defendant Carl Holdren, also known as "Killa," was a lieutenant or LT.

At approximately midnight on November 22, 2006, Long Branch Police Department (LBPD) dispatched officers to investigate 911 reports that two men had been shot inside a residence on Hendrickson Avenue. Two victims, Michael Montgomery, a member of

3

the Brims, and Keith Logan, a member of G-Shine, were found at the scene. Logan survived the shooting; Montgomery did not.

The NJSP identified defendants as suspects in the Montgomery/Logan shooting from calls intercepted before and after the shooting. Two days before the shooting, Quemere McClendon, an SMM member known as "Tragedy" or "Trag," called Carter to tell him that G-Shine members "tried to sleepwalk" him, which, Burke explained, meant they were trying to kill or seriously hurt him. McClendon asked for Carter's permission to retaliate and Carter gave him the go ahead. On November 22, 2006, the day of the shooting, Thompson called Carter to report the wrong person was killed and the Brims knew that SMM was responsible.

On December 28, 2006, Michael Stallworth, a Brims member known as "Lock," kidnapped and assaulted an SMM member named "Slash" in retaliation for Montgomery's murder. Stallworth called Thompson, admitted he kidnapped Slash and threatened additional violence.

As documented in the intercepted calls, Thompson directed that Stallworth be shot, and Holdren agreed to shoot him. Thompson laid out a plan for the killing. He ordered Zachery Butts, another SMM member, to obtain a rental car and deliver a gun to Holdren for the purpose of killing Stallworth. Butts obtained a rental car, a 2006 silver Mitsubishi Galant, and the gun. The plan was

A-5071-13T1

foiled when the rental car was stopped for speeding by Lakewood Police and, acting on information received from the NJSP, officers searched the car and recovered the gun.

Holdren and Thompson (collectively, defendants) were charged along with four other defendants[1] in a twenty-four count indictment. Both were charged with first-degree racketeering, N.J.S.A. 2C:41-2(c)-(d) (count one); first-degree conspiracy to murder Logan, N.J.S.A. 2C:5-2 (count two); three counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) and N.J.S.A. 2C:2-6 (counts three, five and twenty); first-degree attempted murder of Logan, N.J.S.A. 2C:11-3(a), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:2-6 (count four); first-degree purposeful or knowing murder of Montgomery, N.J.S.A. 2C:11-3(a)(1)-(2) and N.J.S.A. 2C:2-6 (count six); first-degree conspiracy to murder Stallworth, N.J.S.A. 2C:5-2 (count nineteen); and first-degree attempted murder of Stallworth, N.J.S.A. 2C:11-3(a), N.J.S.A. 2C:5-1, and N.J.S.A. 2C:2-6 (count twenty-one). Neither Thompson nor Holdren were charged in counts ten through seventeen.

In addition, Holdren was charged with second-degree conspiracy to commit armed robbery of J.H., N.J.S.A. 2C:5-2 (count

---

[1] The other four defendants are: Butts, McClendon, Paul Lewis, and Darnell Stovall, all of whom were members of SMM.

seven), an additional count of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count eight) and first-degree armed robbery of J.H., N.J.S.A. 2C:15-1(a)(2) and N.J.S.A. 2C:2-6 (count nine). Holdren was convicted by a jury on counts one through six, nineteen, twenty and twenty-one). He was found not guilty on counts seven, eight, and nine.

Thompson was also charged with third-degree possession with intent to distribute cocaine to a juvenile, N.J.S.A. 2C:35-5(a)(1), (b)(3), N.J.S.A. 2C:35-8, and N.J.S.A. 2C:2-6 (count eighteen); third-degree possession of a controlled substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3) and N.J.S.A. 2C:2-6 (count twenty-two); and third-degree possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b) (count twenty-three). He entered a guilty plea pursuant to a plea agreement to counts one, two, four, six, nineteen and twenty-one.

In his appeal, Holdren presents the following arguments for our consideration:

> POINT I
>
> DENIAL OF THE DEFENDANT'S APPLICATION FOR SEVERANCE OF COUNTS 19 AND 21 FROM THE OTHER COUNTS IN THE INDICTMENT WAS ERROR.
>
> POINT II
>
> THE WARRANTLESS SEARCH OF THE MITSUBISHI GALANT VIOLATED THE

DEFENDANT'S RIGHT TO BE FREE FROM UNLAWFUL SEARCH AND SEIZURE GUARANTEED BY THE NEW JERSEY AND FEDERAL CONSTITUTION.

POINT III

THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT.

POINT IV

DETECTIVE VIRGILIS [SIC] GANG TESTIMONY SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE BECAUSE IT WAS AN IMPROPER "NET OPINION" AND OPINED ABOUT THE ULTIMATE ISSUE TO BE DECIDED BY THE JURY.

POINT V

THE STATE FAILED TO PROVE THAT DEFENDANT'S ACTIONS AFFECTED TRADE AND COMMERCE TO SUPPORT THE RACKETEERING CONVICTION.

POINT VI

ADMISSION OF IRRELEVANT AND IMMATERIAL EVIDENCE REGARDING POSSESSION OF A WEAPON BY SOPHIA JOHNSON DEPRIVED DEFENDANT OF A FAIR TRIAL.  (NOT RAISED BELOW).

POINT VII

DENIAL OF THE DEFENDANT'S MOTION FOR NEW TRIAL WAS ERROR.

POINT VIII

THE AGGREGATE SENTENCE IMPOSED UPON MR. HOLDREN OF LIFE PLUS 40 YEARS WITH 92 1/2 YEARS OF PAROLE

INELIGIBILE [SIC] WAS MANIFESTLY
EXCESSIVE AND MUST BE MODIFIED AND
REDUCED. (NOT RAISED BELOW).

POINT IX

THE AGGREGATE ERRORS DENIED
DEFENDANT A FAIR TRIAL. (NOT RAISED
BELOW).

Thompson argues his conviction and sentence should be set aside based on the following arguments:

POINT I

THE TRIAL COURT ERRED IN DENYING THE
MOTION TO SUPPRESS EVIDENCE
RECOVERED FROM THE RENTAL CAR.

POINT II

THE TRIAL COURT ERRED IN DENYING THE
MOTION TO SUPPRESS EVIDENCE
RECOVERED FROM CARL HOLDREN'S
BEDROOM.

POINT III

THE MATTER SHOULD BE REMANDED FOR
RESENTENCING BECAUSE THE TRIAL
COURT FAILED TO STATE REASONS FOR
IMPOSING A CONSECUTIVE SENTENCE ON
COUNT ONE.

After reviewing these arguments in light of the record and applicable principles of law, we conclude that none of them have merit. We further conclude that the arguments raised in Points I, III, V, VI, VII and IX of Holdren's appeal merit limited or no discussion. R. 2:11-3(e)(2).

We first address Holdren's challenges to the trial court's denial of his pretrial motions for severance and the dismissal of the indictment. These arguments lack merit and warrant only limited discussion.

A.

Holdren filed a motion to sever counts nineteen through twenty-one, which charged him with conspiracy to murder Stallworth, attempted murder of Stallworth and possession of a handgun for an unlawful purpose to use against Stallworth. The State opposed the motion, arguing that each of these offenses were alleged as predicate acts for the racketeering offense charged in count one.

As the trial court noted, all the charges were properly joined under Rule 3:7-6. The trial court reviewed the potential for prejudice that would justify severance, see R. 3:15-2(b), noted Holdren failed to identify any undue prejudice beyond the mere "danger of association," and determined the State's interest and judicial efficiency outweighed any prejudice Holdren would suffer. We agree.

B.

In Point III, Holdren argues the trial court erred in denying his motion to dismiss the indictment based upon the State's alleged

failure to present exculpatory evidence to the grand jury.

During a grand jury proceeding, the prosecutor must present any evidence that "both directly negates the guilt of the accused and is clearly exculpatory." State v. Saavedra, 222 N.J. 39, 63 (2015) (quoting State v. Hogan, 144 N.J. 216, 237 (1996)). To be clearly exculpatory, "the evidence must 'squarely refute[] an element of the crime.'" Ibid. (alteration in original) (quoting Hogan, supra, 144 N.J. at 237). A prosecutor's failure to do so warrants dismissal of the indictment but courts are directed to "act with substantial caution before concluding that a prosecutor's decision in that regard was erroneous"; such relief is appropriately granted in an "exceptional case." Ibid. (quoting Hogan, supra, 144 N.J. at 238-39). We review the trial court's decision for abuse of discretion. Id. at 55.

The State presented testimony from Detective Michael Verdadeiro about conversations he had with two women, B.R. and N.D. The women told Verdadeiro they knew Holdren well, saw him at the scene of the shooting, standing beside a masked man and that, after Montgomery and Logan pulled up to the house, "[Holdren] and the second man began shooting at them and everybody fled the scene." The alleged exculpatory information was that, in their formal statements, B.R. and N.D. stated they did not observe Holdren with a gun. B.R. stated she saw the masked man shooting

a gun; N.D. stated she did not see either man with a gun but heard the gunshots.

The trial court denied defendant's motion, finding the statements did not meet the standard for exculpatory information that required its presentation to the grand jury. The trial court noted that, although the witnesses were unable to state they saw a gun in Holdren's hands, they did not state affirmatively that Holdren did not have a gun. We note further that Holdren was charged both as a principal and an accomplice in the murder, and that, even when the formal statements are considered, they do not "directly negate[]" his guilt. Id. at 63 (quoting Hogan, supra, 144 N.J. at 237). The motion to dismiss the indictment was, therefore, properly denied.

### III.

Both defendants argue the trial court erred in denying their motions to suppress the gun seized from the 2006 Mitsubishi Galant rental car.

### A.

The parties stipulated to a statement of facts for the suppression hearing, which we summarize. The stipulation acknowledged the ongoing investigation, Burke's training and experience regarding street gangs and his understanding of calls

intercepted on December 28, 2006. Burke advised the officer conducting surveillance of SMM of the following:

One of Thompson's SMM members had been attacked by members of the Brims in retaliation for the Montgomery's death. Montgomery was shot and killed when Thompson, along with Holdren and McClendon, allegedly attempted to murder another gang member, Logan. Unlike Montgomery, Logan was only injured and survived the shooting. Thompson ordered Holdren to shoot Stallworth and arranged for Butts to give Holdren a gun.

As a result of this information, surveillance was initiated by Detective Kevin Plumaker, Detective Lieutenant Michael Sovey, Detective Michael Smith, and State Trooper David Tabon, and others of the residence of C.P., Butts's girlfriend, in Freehold.

At approximately 4:15 p.m. on December 28, 2006, Tabon followed Butts and C.P. to a car rental agency where Butts obtained a 2006 silver Mitsubishi Galant. Tabon then followed Butts back to C.P.'s residence, arriving at approximately 5:15 p.m.

In a conversation between Butts and Thompson intercepted at approximately the same time, Butts told Thompson he had obtained a rental car and that he suspected law enforcement officers were following him. A few minutes later, Sovey observed Butts enter the rental car and leave C.P.'s residence, wearing a "Lakers"

jacket.  Sovey followed Butts to A.W.'s residence, where A.W. joined Butts in the rental car.  Sovey and Plumaker followed them.

At approximately 5:50 p.m., Sovey pulled into a retail parking lot and parked because he perceived Butts and A.W. might again suspect they were being followed.  However, A.W. drove into the same parking lot.  There were also three other cars present: C.P.'s vehicle, a black Dodge Charger with a New York license plate, and a green Ford Expedition bearing a New Jersey license plate.  A number of people stood around outside the vehicles.

Sovey noted the trunks of the rental car and the black Dodge Charger were open.  Two unknown men stood in front of the trunks as if they were standing guard or trying to block the view of the trunks.  A third unknown person handed a white plastic bag to Butts, who was wearing the same Lakers jacket observed earlier. Butts placed the white plastic bag in the trunk of the rental car. Sovey transmitted his observations to the other officers.  The men then closed both trunks and everyone left in their respective vehicles.

Plumaker followed Butts back to C.P.'s residence, arriving at approximately 6:50 p.m.  In a conversation intercepted during the drive, Butts told Thompson he was being followed by law enforcement officers.  Butts left C.P.'s residence at approximately 7:15 p.m., minutes before Thompson arrived, and

13

returned at approximately 7:25 p.m.  Other known SMM members were observed leaving and returning to the residence.

At approximately 10:10 p.m., Plumaker observed Butts placing a white item in the trunk of the rental car.  He did not observe whether the item was brought from elsewhere or simply removed from the trunk and then replaced inside it.  Approximately ten minutes later, Butts entered the rental car with A.W. and two others and A.W. drove away.

Sovey followed the rental car along local roads but lost track of it when it turned sharply into a retail parking lot on Route 9 in Howell.  Sovey informed the Ocean County Prosecutor's Office that he had lost track of the rental car.  NJSP issued a "be on the look out" (BOLO) bulletin for the make, model and registration number of the rental car.

Sometime thereafter, Sergeant Maureen McGilloway of the Lakewood Police Department received the BOLO information from a state trooper, who told her "troopers conducting surveillance had lost sight of the suspect vehicle and had requested assistance." The trooper also said there was a safety concern because there was a gun in the rental car. Sergeant McGilloway reported this information to the Lakewood Police Department.

Officer David Silberstein of the Lakewood Police Department observed the rental car speeding and initiated a stop. Another Lakewood police officer, Christopher Matlosz, joined him.

Silberstein confirmed the rental car's registration number was for a vehicle sought by the NJSP. Silberstein told Matlosz to stay back, as the BOLO bulletin stated "the suspects had a weapon and were considered dangerous."[2] The officers were advised to hold the occupants and wait for members of the Prosecutor's Office, NJSP and U.S. Marshals. Dispatch called for additional Lakewood Police officers to respond to the scene.

Silberstein ordered A.W. "to turn the car off and drop the keys from the window" and he complied. Using the loudspeaker, Silberstein then ordered the occupants of the rental car "to keep their hands in view outside of the windows of the vehicle." Significant time passed and multiple Lakewood Police Officers arrived at the scene.

Because he knew there was a weapon in the rental car, Silberstein began to remove the occupants from the vehicle. Each

---

[2] Although Silberstein correctly identified the registration number as that in the BOLO bulletin, he mistakenly believed he had stopped a vehicle that was the subject of a different BOLO bulletin related to the shooting of a gang member that had occurred earlier that day.

occupant was removed individually, checked for weapons, handcuffed and placed in a patrol vehicle.

Several officers then searched the rental car for the weapon. Flashlights were used to look into the passenger compartment of the vehicle. A bag found in the passenger compartment was searched; it did not contain a weapon. An access door to the trunk was set in the middle seat armrest of the rear passenger seat. An officer pushed a button that opened the trunk.

Smith used a flashlight to look into the open trunk of the rental car and observed a false floor panel covering the spare tire was partially open. Without moving the floor panel or anything else inside the trunk, Smith "observed the handle of a firearm exposed from within a white plastic bag that was underneath that opening in the floor panel." He seized the weapon, "a black .45 caliber H-1 [sic] Point firearm, Serial Number 338969," which "was loaded with six hollow-point rounds; one in the chamber and five in the magazine." The officers turned the weapon over to the Lakewood Police Department and called dispatch to impound the rental car.

In a conversation intercepted between Thompson and Holdren soon after the rental car was stopped, they stated they suspected Butts had been detained by the police, because he never arrived to deliver the weapon to Holdren.

16

The constitutional standard applicable at the time of the warrantless search of the rental car[3] was set forth in State v. Pena-Flores, 198 N.J. 6 (2009). For a warrantless search of an automobile to fall within the automobile exception to the warrant requirement, the State was required to prove: "(1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant." Id. at 28.

Defendants do not challenge the first two of these criteria. They argue the circumstances did not present any exigency to justify a warrantless search. Thompson argues "exigency only

---

[3] In State v. Witt, 223 N.J. 409 (2015), the Supreme Court abandoned the "pure exigent-circumstances requirement" it had added to the constitutional standard to justify an automobile search and returned to the standard set forth in State v. Alston, 88 N.J. 211 (1981), "that a warrantless search of an automobile was constitutionally permissible, provided that the police had probable cause to search the vehicle and that the police action was prompted by the 'unforeseeability and spontaneity of the circumstances giving rise to probable cause,'" Witt, supra, 223 N.J. at 414 (quoting Alston, supra, 88 N.J. at 233. The Court observed "[t]he Alston standard was seemingly consistent with the federal exception to the warrant requirement." Ibid. The Court made clear this standard was to be given prospective application. Id. at 449. Therefore, as the State concedes, it was required to prove the existence of exigent circumstances to justify a warrantless search of the rental car under the automobile exception.

exists where the concern is the destruction or loss of evidence." Holdren argues there was no exigency here because the occupants of the vehicle were removed and secured before the warrantless search was conducted. Neither argument has merit.

"[E]xigency in the constitutional context amounts to 'circumstances that make it impracticable to obtain a warrant when the police have probable cause to search the car.'" State v. Cooke, 163 N.J. 657, 676 (2000) (quoting State v. Colvin, 123 N.J. 428, 437 (1991)). We determine the existence of exigency "on a case-by-case basis" under "the totality of the circumstances," Pena-Flores, supra, 198 N.J. at 28, employing "a fact-sensitive, objective analysis," State v. Walker, 213 N.J. 281, 292 (2013) (quoting State v. DeLuca, 168 N.J. 626, 632 (2001)).

Most commonly, exigency within the context of an automobile search is presented because police officers believe contraband is located within the car and the danger exists that the suspect or an associate can destroy or conceal the contraband if police do not intervene. See, e.g., Cooke, supra, 163 N.J. at 673 ("There is an urgent, immediate need to search a vehicle when there is a realistic possibility that someone may remove the vehicle or its contents."). Under such circumstances, the exigency may be diminished by factors that reduce that probability, such as the arrival of other police officers to secure the scene. See, e.g.,

State v. Dunlap, 185 N.J. 543, 551 (2006) (noting that "the presence of ten officers" at the scene of an automobile search particularly justified the "conclusion that exigency was absent").

This case presented a different type of exigency that was more threatening. Based on the intercepted calls, the officers had probable cause to believe Thompson had ordered the killing of Stallworth and articulated a plan for carrying it out that called for Butts to acquire the gun and use a rental car to deliver the gun to Holdren. Surveillance established the plan was in progress when the rental car was stopped by police. The exigency arose out of the need to locate that gun and thwart the murder plot. While it is undisputed the officers had probable cause to believe a firearm was in the rental car, the facts also supported a reasonable belief that the defendants, who suspected they were under police surveillance, disposed of the gun during the periods when police officers lost sight of them. As the trial court noted here, the situation demanded the police ascertain expeditiously whether the gun was in the car or not for if it was not, the police would have to redouble their efforts to locate it elsewhere.

In State v. Alvarez, 238 N.J. Super. 560, 567-68 (App. Div. 1990), we listed some of the factors the Supreme Court had recognized in State v. Hutchins, 116 N.J. 457 (1989), and State v. Lewis, 116 N.J. 477 (1989), as contributing to a finding that

an exigency existed.  A number of those factors are present here: "the degree of urgency involved and the amount of time necessary to obtain a warrant"; "reasonable belief that the contraband is about to be removed"; "information indicating the possessors of the contraband are aware that the police are on their trail"; "the gravity of the offense involved"; "the possibility that the suspect is armed"; and "the strength or weakness of the facts establishing probable cause."  Alvarez, supra, 238 N.J. Super. at 568.

The confluence of these factors here resulted in "a public emergency and a law enforcement nightmare" that was not dissipated when the occupants of the rental car were removed and secured. State v. Wilson, 362 N.J. Super. 319, 333 (App. Div.), certif. denied, 178 N.J. 250 (2003) (holding exigency continued after six shots were fired on public street one block from Atlantic City boardwalk and no gun was found on the suspect because there was "real danger" the gun was hidden or discarded in a public place and would be lost as evidence or "fall into malevolent, untrained or immature hands").

We therefore conclude the officers were presented with exigent circumstances that justified the warrantless search of the rental car.

IV.

A warrantless search of Holdren's bedroom resulted in the

20

seizure of various items: a black North Face jacket with the words "Dark City" written on the back, a red bandana, a red do-rag, a cell phone, four photographs, an electronic scale, and "miscellaneous papers related to [SMM] of the Bloods." The State contended the search was conducted pursuant to a valid consent to search given by Holdren's foster mother, Michelle Dalton. On appeal, Thompson challenges the search and seizure; Holdren does not.

A.

Sergeant Brian Veprek of the Monmouth County Prosecutor's Office (MCPO) and Dalton testified at the suppression hearing, providing different accounts.

According to Veprek, he first went to Dalton's residence after Holdren was identified as a suspect in the shootings to confirm Holdren lived there and to see if Holdren would voluntarily go to the MCPO to talk about the investigation. Dalton answered the door and brought Holdren to the door. Holdren agreed to accompany the officers to the MCPO. No request was made for any consent to search the residence at this time.

On December 30, 2006, Veprek returned to the residence with two other officers in unmarked police cars. As before, Dalton answered the door and brought Holdren to the door at Veprek's request. Holdren agreed to accompany the officers to the LBPD to

be interviewed. The police did not have an arrest warrant for Holdren and, according to Veprek, no one said he was under arrest and Holdren was not placed in handcuffs. Both Holdren and Dalton were calm and cooperative as they had been during the prior visit.

Detective Sergeant Fernando Sanders advised Veprek that Dalton stated she had been a probation officer or a corrections officer. Veprek conceded he lacked probable cause to obtain a search warrant at that time but decided to "give it a shot in the dark" and ask for consent to search Holdren's bedroom. When he asked, Dalton agreed to provide her consent to the search.

Veprek testified he read the consent form to Dalton. He said the form states the signatory has been advised of: the right to refuse the search, to revoke consent, to be present during the search, and to authorize police to remove items of evidential value; and that the signatory gives police "this permission voluntarily, of [his or her] own free will, without coercion, fear, or threat." Dalton read the form aloud and signed the form. Veprek and Sanders signed the form as witnesses. During this process, Dalton appeared "calm and cooperative," just as she was during her conversation with Sanders and during the prior visit.

Dalton brought the officers to Holdren's bedroom. The door was open and unlocked; no padlock was on the door. Veprek saw the items that were seized in plain view. Dalton was in the room

during the entire search, which lasted about ten minutes. When Veprek found the SMM paperwork, he told Dalton that Holdren was a member of a Bloods street gang. Dalton's demeanor changed and she became visibly upset.

Veprek testified no officer ever threatened Dalton. They did not tell her they would "tear her house apart"; they did not draw their weapons at any point during either visit; and there was no weapon pointed on the house on a tripod. He testified Dalton did not express fear or reluctance during the search and did not appear coerced.

Dalton testified she had worked as a corrections officer for Monmouth County Correctional Facility for six years until 1996. As a corrections officer, she attended the police academy and took a course dealing with search and seizure issues.

She explained Holdren began living in her house when he was fifteen years old, and she gave him his own bedroom. She became Holdren's foster mother through the Division of Youth and Family Services (DYFS) when Holdren was seventeen years old. DYFS sent Dalton a monthly check to pay for Holdren's expenses until he turned eighteen in July 2006, at which point DYFS began sending the checks directly to Holdren. Dalton testified Holdren cashed his checks and gave all the money to her to pay for his rent, food, utilities, and clothes, and Dalton gave some money back to

23

him as "[s]pending money." She testified Holdren kept his bedroom door closed, but she sometimes did his laundry and had access to his room to put clean clothes or linens on his bed.

Dalton testified that when she answered the door on December 30, 2006, she saw three police officers in plain clothes, one of whom was pointing a gun on a tripod at the door. She explained she was "petrified" and "startled," and her first words to the officers were, "what do you want to do, shoot me?" She confirmed she called Holdren outside on the officers' request, but stated they handcuffed Holdren as he was walking to the unmarked police car. She also testified there were two marked police cars from the Lakewood Police Department with uniformed officers.

She testified that, when the officers asked her for permission to search, "I felt like I had to let them search. If not, they would tear up the house. I had no choice in the matter." She confirmed she remained calm, and signed the form because there was "a cop in front of the house with a gun, and [she] felt like [she] had no choice, but to let them search." She stated the police did not go over the form with her, that she signed it "because [she] did not want [her] . . . home to be destroyed." Dalton stated further she did not sign the form until she and the officers were already inside Holdren's bedroom.

Dalton testified Holdren usually kept his bedroom door

24

closed, but she confirmed there was no lock on the door and the door was open before the police entered to search. She explained the search lasted about twenty or twenty-five minutes and she was very upset, though she maintained her composure and did not cry while the officers were there.

The trial court found Veprek "highly credible" and found portions of Dalton's testimony not credible. Dalton appeared evasive during cross-examination and generally inconsistent and unreliable. The court specifically rejected Dalton's testimony that the police arrived on December 30 with a gun on a tripod pointed at the house and her testimony that the officers asked her to sign the consent form after they were already inside the house. Noting Dalton was a former corrections officer and a "strong woman," the court found she knew her rights, could not be forced to do something she did not want to do, and would have complained if she could not stop the search. The court also reasoned that, if the officers were going to coerce Dalton, it was more likely they would have completed the search before seeking her written consent to search. The court concluded Dalton's consent was free, voluntary, and not the result of coercion.

The trial court also determined Dalton's consent was valid because she had "common authority" over the searched area. The court found the relationship between Dalton and Holdren was more

like a foster parent or guardian to a child than like a landlord to a tenant. The court noted Dalton repeatedly referred to Holdren as her son during her testimony and that Holdren gave all his DFYS money to Dalton, who then gave him an allowance. The court also noted Dalton had "complete access to that room, to change the bed, to do his clothes, to go into his hamper," and it was an "open room." The court noted Holdren took no "special steps to protect his personal effects from the scrutiny of the other residents," he did not use a lock on his door or any containers in his room, and he left the door open when he left to go with the police.

B.

Thompson argues the trial court erred in denying the motion to suppress evidence recovered in Holdren's bedroom because Dalton did not have authority to consent to the search, and, even if she did, her consent was not voluntary. For support, he relies on Dalton's testimony that Holdren paid her rent, Holdren kept his door closed, and she only had access to place clean clothes or linens on his bed. Thompson also cites her testimony, rejected by the trial court, that she felt she had "no choice" after being threatened by the police.

In reviewing a trial court's decision in a suppression motion, we defer to its factual findings that are "supported by sufficient credible evidence," disturbing only those findings that "are so

clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Scriven, 226 N.J. 20, 32-33 (2016) (quoting State v. Elders, 192 N.J. 224, 243-44 (2007)). Our review of the legal conclusions based on those findings is de novo. Ibid.

To withstand the suppression motion, the State was required to show proper consent was given freely and voluntarily. State v. Coles, 218 N.J. 322, 338 (2014). This requires proof that Dalton "knowingly waived [her] right to refuse to consent to the search." State v. Lamb, 218 N.J. 300, 315 (2014) (quoting State v. Domicz, 188 N.J. 285, 308 (2006)). Any consent must not be "the result of duress or coercion, express or implied." Ibid. The State must "show that the individual giving consent knew . . . she 'had a choice in the matter.'" State v. Carty, 170 N.J. 632, 639 (quoting State v. Johnson, 68 N.J. 349, 354 (1975)), modified 174 N.J. 351 (2002).

Giving appropriate deference to the trial court's opportunity to weigh the credibility of the witnesses, the record provides ample support for the trial court's finding that Dalton voluntarily gave her consent to the warrantless search of Holdren's bedroom. She signed a consent to search form that advised her of her rights to refuse the search. Moreover, as a former corrections officer, she had attended the police academy and was familiar with her

27

rights. In addition to finding Dalton's testimony regarding coercive behavior by the police was not credible, the trial court reasoned that, after finding both Dalton and Holdren "calm and cooperative," in their first visit to the residence, the officers would have no reason to change their tactics to adopt a threatening approach.

We therefore turn to the legal question, whether Dalton had the authority to consent to the search.

A third party can provide valid consent to a search of the defendant's home if that person has "joint occupation" of and "common authority" over the premises. State v. Cushing, 226 N.J. 187, 199-200 (2016) (quoting Fernandez v. California, __ U.S. __, __ , 134 S. Ct. 1126, 1132-33, 188 L. Ed. 2d 25, 32-33 (2014); see also State v. Suazo, 133 N.J. 315, 319-20 (1993)). Although a landlord generally lacks such authority regarding a tenant's premises, a parent generally can authorize a search of the room of an adult child. Cushing, supra, 226 N.J. at 200-01; State v. Coles, 218 N.J. 322, 340-41 (2014). The payment of rent does not necessarily result in the application of a landlord-tenant relationship to the equation. Coles, supra, 218 N.J. at 341 n.5.

In assessing the consent given by Dalton, the "question is 'whether the officer's belief that the third party had the authority to consent was objectively reasonable in view of the

28

facts and circumstances known at the time of the search.'" Id. at 340 (quoting Suazo, supra, 133 N.J. at 320). The "officers need not ultimately be factually correct about a party's ability to consent to a search." Ibid.

In Coles, the Court stated the ultimate question "remains one of objective reasonableness based on an assessment of the totality of the circumstances." Id. at 341. When an adult child is living with parents, determining whether a child has exclusive possession of his room, appropriate factors to consider include "whether the child pays rent; whether the parent has access to the child's room for cleaning or other such general access purposes; and whether the child has the right to lock the door to deny access." Id. at 340 (footnote omitted) (citing State v. Crumb, 307 N.J. Super. 204, 245 (App. Div. 1997), certif. denied, 153 N.J. 215 (1998)).

Dalton testified that Holdren had no lock on his door and the door was open at the time she consented to the search. Dalton had access to Holdren's room to do his laundry and return it to his bed. Although Holdren gave Dalton money purportedly for "rent," the trial court viewed this less as a business transaction and more of a familial contribution because Holdren merely gave Dalton his monthly DYFS check, which had been going directly to Dalton before he turned eighteen, and she gave him spending money from that sum. These findings are supported by credible evidence and

29

provide sufficient support for the conclusion that Dalton had common possession of Holdren's bedroom. We therefore agree with the trial court that Dalton was authorized to provide consent for the search of Holdren's bedroom. The motions to suppress the evidence seized from that search were properly denied.

## V.

In Points IV and VI, Holdren challenges the admission of evidence, specifically, opinion testimony from NJSP Sergeant Thomas J. DeVirgiliis regarding the effects of gang activity on trade and commerce in Monmouth and Ocean Counties, and testimony that S.J. possessed a gun near the shooting scene.

We grant substantial deference to the trial court's discretion on evidentiary rulings unless it is a clear error of judgment or so wide of the mark that a manifest denial of justice results. See, e.g., State v. Koedatich, 112 N.J. 225, 313 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989); State v. Carter, 91 N.J. 86, 106 (1982); State v. E.B., 348 N.J. Super. 336, 344-345 (App. Div. 2002). Moreover, because there was no objection to the testimony now challenged on appeal, our review is limited to a search for plain error, State v. Gore, 205 N.J. 363, 383 (2011), that is, an error "clearly capable of producing an unjust result," State v. Reeds, 197 N.J. 280, 298 (2009) (quoting R. 2:10-2). Reversal of a "conviction is required

only if there was error 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'"  State v. Atwater, 400 N.J. Super. 319, 336 (App. Div. 2008) (alteration in original) (quoting State v. Daniels, 182 N.J. 80, 95 (2004)).

A.

Holdren was charged with conspiracy to commit racketeering, N.J.S.A. 2C:41-2(c) and (d).  To convict him under this statute, the State had to show Holdren was employed by or associated with a racketeering enterprise that "affect[ed] trade or commerce" in New Jersey.  State v. Casilla, 362 N.J. Super. 554, 565 (App. Div.), certif. denied, 178 N.J. 251 (2003); N.J.S.A. 2C:41-2(c).

DeVirgiliis was qualified as an expert specifically "in the history, structure, rules, regulations, practices, terminology and dynamics of the Bloods street gang."  In Point IV, Holdren argues that DeVirgiliis's testimony regarding the effects of gang activity on trade and commerce in Monmouth and Ocean counties in November and December 2006 was an impermissible net opinion because it was rendered "without any factual or scientific basis" and "was nothing more than a hypothesis as to what occurred."  He further argues "[i]t was grossly improper for [DeVirgiliis] to opine on that element of the [racketeering] offense that needed to be proven by the State."  He also contends the jury charge that they could

either accept or reject expert opinions "did not dissipate the prejudice from the testimony."

Because our New Jersey RICO statute is modeled upon its federal counterpart, it is appropriate to look to federal RICO cases for guidance. State v. Cagno, 211 N.J. 488, 508 (2012). Like our statute, the federal statute requires proof of an effect on commerce, the difference being that, under 18 U.S.C.A. § 1962(c), the racketeering activity must affect interstate commerce, and under our statute, the activity must only affect trade or commerce. Casilla, supra, 362 N.J. Super. at 564-65. In assessing the sufficiency of proof to satisfy this element under the federal statute, "[a] minor or minimal influence on interstate commerce is sufficient." United States v. Farmer, 924 F.2d 647, 651 (7th Cir. 1991). The "required nexus between the activities of the enterprise and interstate commerce need not be great," and will be satisfied, "for example, where the enterprise obtains 'supplies from companies located outside' the state." Ibid. The expansive definition of "trade or commerce" included in our statute similarly suggests that a minor influence is sufficient to satisfy this element of the RICO offense. N.J.S.A. 2C:41-1(h) states, "'Trade or commerce' shall include all economic activity involving or relating to any commodity or service." (Emphasis added).

At trial, DeVirgiliis testified, without objection, that the

Bloods make money "primarily . . . through selling drugs, . . . guns . . . and through extortion, robbery, and even prostitution." Asked specifically how the various sets of the Bloods had an effect on trade and commerce in Monmouth and Ocean Counties, DeVirgiliis stated:

> [T]hat would be tied into the propensity toward violence that the Bloods street gang has always demonstrated. Particularly in this investigation with them talking about the war . . . with the Brims, <u>getting guns, handguns</u>, trips, they want a chopper, that affects trade and commerce, because that instills fear in citizens who don't want to leave their homes, who don't want to travel to the store and down the street from their residence.
>
> It also is a trickle-down effect, because those individuals or community members are living in a fear in a gang-infested area. They fear for their safety. They may leave the area. They may just go to the store. And in turn . . . [there is] a trickle-down effect towards the stores because they are not receiving the business. And then those businesses either are terminated, they go out of business or they may leave the area and try a new area to set up shop.
>
> [(Emphasis added).]

In light of the minimal impact required to satisfy the "trade or commerce" element, DeVirgiliis's testimony that the Bloods were getting guns during the course of this investigation was sufficient to prove the requisite effect. That testimony also fell within the scope of his qualifications as an expert. But, DeVirgiliis

went on, without objection, to provide not only the gratuitous opinions cited above but also to opine about the reactions of residents to gang presence.

Holdren does not challenge the trial court's decision to qualify DeVirgiliis as an expert "in the history, structure, rules, regulations, practices, terminology and dynamics of the Bloods street gang." The thrust of his argument is that DeVirgiliis lacked an adequate basis to provide an opinion on the specific effects of gang activity on the local economy and housing market and that his opinion impermissibly trod upon the ultimate issue the jury had to decide — whether the activity affected trade or commerce. There is merit to this criticism.

N.J.R.E. 702 permits qualified expert witnesses to testify "in the form of an opinion or otherwise," and N.J.R.E. 703 governs the information "upon which an expert bases an opinion or inference." Under N.J.R.E. 703, an expert opinion may be based on "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject." State v. Townsend, 186 N.J. 473, 494 (2006) (citation omitted); Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 1 on

N.J.R.E. 703 (2017). "The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, supra, 186 N.J. at 494. An expert's conclusion is inadmissible if it is "based merely on unfounded speculation and unquantified possibilities." Townsend v. Pierre, 221 N.J. 36, 55 (2015) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div.), certif. denied, 154 N.J. 607 (1997)). "[W]hen an expert speculates, 'he ceases to be an aid to the trier of fact and becomes nothing more than an additional juror.'" Ibid. (quoting Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div.), certif. denied, 145 N.J. 374 (1996)).

DeVirgiliis admitted his opinion was based solely on "what [he had] seen . . . being a street gang investigator." He lacked any factual evidence or data to provide a basis for an opinion about the specific nexus he described between gang activity and an alleged, generalized decline in business.

Moreover, an expert may not "usurp the jury's function by . . . opining . . . in a manner that . . . invades the province of the jury to decide the ultimate question." State v. McLean, 205 N.J. 438, 453 (2011). When DeVirgiliis's opinion extended beyond the testimony that the gang was involved in procuring guns during the time of the investigation to include a conclusion that

the activity affected trade or commerce, his testimony invaded the jury's province.

We conclude, however, that this testimony did not have the clear capacity to produce an unjust result. Within the context of the evidence that defendants readily resorted to violence to settle scores, DeVirgiliis's unsupported theory had little potential to prejudice Holdren. The speculative basis for his opinion was revealed through cross-examination when DeVirgiliis admitted he had not done any research on SMM's effect on trade and commerce in Monmouth and Ocean counties and had not personally spoken to anyone in those communities who felt the effects of gang activity. Furthermore, the trial court's jury instructions clearly specified the jury was free to accept or reject expert testimony.

More important, when the challenged testimony is set aside, there was more than ample evidence to prove the requisite element that SMM's activities, which included transactions in guns, affected trade or commerce. Therefore, the inclusion of this testimony did not amount to plain error. See R. 2:10-2.

B.

In Point VI, Holdren argues the admission of testimony that S.J. possessed a gun shortly after the shooting warrants a new trial because (1) it was "irrelevant and immaterial" under N.J.R.E.

36

401; and (2) it was "misleading," "confusing," and "prejudicial" under N.J.R.E. 403.

The testimony challenged on appeal came from two officers who responded to the shooting scene. S.J., a known member of G-Shine, who had been seen with Logan in the past, was observed near the crime scene. She was detained at the scene and a loaded black Glock 22 .40 caliber gun was recovered from a car she had been observed entering. This gun was not used in the Montgomery/Logan shooting.

The State contends this evidence was relevant because it showed the thoroughness of its investigation. We disagree. The evidence regarding S.J.'s possession of a gun that was unconnected to the shooting had no probative value as to any of the essential elements of the offenses charged against Holdren. See State v. Buckley, 216 N.J. 249, 262 (2013). The evidence therefore did not meet the standard for relevance as defined in N.J.R.E. 401 (evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action.").

But, in the absence of any objection to the testimony from two separate witnesses, there was nothing inherently prejudicial about the evidence to alert the trial court of any need to act, sua sponte, to exclude the testimony. Further, in considering

whether the admission of this evidence had the clear capacity to produce an unjust result, we note Holdren admits "Johnson was not a co-conspirator of [his] and was in fact identified as a G-Shine member, a supposed enemy." There was, then, little danger the jury would infer Holdren's guilt from S.J.'s possession of a gun near the shooting. We are satisfied this testimony lacked any capacity to produce an unjust result and, therefore, there was no abuse of discretion in the trial court's tacit admission of this testimony.

## VI.

We next turn to Holdren's arguments that the trial court erred in denying his motions for a judgment of acquittal and for a new trial. These arguments merit only limited discussion.

## A.

In Point V, Holdren argues the trial court erred in denying the motion he made at the conclusion of the State's case, and renewed following the verdict, for a judgment of acquittal on count one, the racketeering charge. At the conclusion of the State's case, Holdren moved for a judgment of acquittal on the racketeering count for failure to prove his actions affected trade or commerce. The trial court denied the motion because it believed the State made out "a prima facie case that he may have been engaged in trade or commerce" by either "the selling and buying

38                                              A-5071-13T1

of guns" or "[t]he selling or buying of drugs."  After the jury did not find the State had proven the predicate acts of drug distribution and possession of drugs with intent to distribute, defendant renewed his motion.

The indictment alleged thirteen predicate acts for the racketeering charge.  The jury found the State had proven beyond a reasonable doubt: conspiracy to murder Logan, possession of a weapon for an unlawful purpose (Logan), attempted murder of Logan, possession of a weapon for an unlawful purpose (Montgomery), murder of Montgomery, conspiracy to murder Stallworth, possession of a weapon for an unlawful purpose (Stallworth) and attempted murder of Stallworth.  In denying Holdren's motion for the second time, the court found there was "more than enough" evidence for the jury to conclude SMM "was involved in activity which amounted to racketeering activity . . . [a]nd that it did in fact affect trade or commerce."[4]  We agree.

### B.

In Point VII, Holdren argues the trial court erred in denying his motion for a new trial.  He identifies four grounds for granting his motion: (1) the court erred in preventing the defense

---

[4]  We note the similarity between the court's finding as to the strength of evidence on this count and the argument Holdren made to support his claim that the trial court erred in denying his motion for severance.

from questioning a prosecution witness, T.A., regarding an admission by a co-defendant; (2) the verdict was against the weight of the evidence; (3) there was insufficient evidence to support defendant's conviction for the attempted murder of Stallworth; and (4) the racketeering charge should have been dismissed. The first of these arguments requires only limited discussion and the remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

At trial, defendant sought to question T.A., Montgomery's girlfriend, about a statement she made to Montgomery's mother regarding an alleged admission by McClendon. The proposed testimony was that McClendon bragged about shooting Montgomery and Logan and "was holding his waist like he had a piece" during this statement. The State objected. At the hearing conducted out of the presence of the jury, T.A. admitted she did not hear McClendon make the statement and got this information "[j]ust out on the street." The trial court ruled this testimony was double hearsay and sustained the objection.

Holdren argues the excluded testimony should have been admitted as a declaration against interest, pursuant to N.J.R.E. 803(b)(25), and as a statement by a co-conspirator, pursuant to N.J.R.E. 803(b)(5). We disagree.

We review a trial court's evidentiary rulings for abuse of

discretion.  State v. Scharf, 225 N.J. 547, 572 (2016), and find none here.  For a double hearsay statement "[t]o be admitted into evidence, each component of the statement must separately be admissible under an enumerated exception to the hearsay rule." Beasley v. Passaic Cty., 377 N.J. Super. 585, 602 (App. Div. 2005). Neither N.J.R.E. 803(b)(5) nor (25) provide an exception for statements by anonymous strangers to a testifying witness.  The trial court therefore correctly excluded the proposed testimony.

VII.

Finally, we turn to defendants' challenges to their sentences.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010).  The Supreme Court directs appellate courts to determine whether:

> (1) the sentencing guidelines were violated;
> (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)) (internal quotations marks omitted).]

Upon completion of review, appellate courts are "bound to

affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989). An appellate court should modify a sentence "only when the trial court's determination was 'clearly mistaken.'" State v. Jabbour, 118 N.J. 1, 6 (1990) (quoting State v. Jarbath, 114 N.J. 394, 401 (1989)).

## VIII.

Before imposing sentence on Thompson, the trial court stated it considered State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986), and authorities cited by the State regarding the imposition of a consecutive sentence for the racketeering charge. Thompson argues this explanation was inadequate for the imposition of a consecutive sentence on count one, the racketeering count.

At sentencing, however, his counsel did not ask the court to impose concurrent sentences; he asked the court to sentence Thompson in accordance with the plea agreement. The sentence imposed on Thompson was consistent with the recommendation made by the State as part of the plea agreement: (1) a thirty-year sentence with no parole on count six; (2) a concurrent twenty-year sentence, subject to NERA, on counts two, four, nineteen, and

42

twenty-one; and (3) a consecutive ten-year sentence on count one. Count two merged with count four, and count nineteen merged with count twenty-one. Counts three, five, eighteen, twenty, twenty-two, and twenty-three were dismissed.

In Yarbough, supra, 100 N.J. at 643-44, the Supreme Court set forth factors relevant to the determination whether a consecutive sentence is appropriate. Ordinarily, an appellate court must remand for resentencing "[w]hen a trial court fails to give proper reasons for imposing consecutive sentences at a single sentencing proceeding." State v. Randolph, 210 N.J. 330, 353 (2012) (alteration in original) (citation omitted). However, appellate courts may "affirm[] a consecutive sentence where the facts and circumstances leave little doubt as to the propriety of the sentence imposed." State v. Jang, 359 N.J. Super. 85, 98 (App. Div.), certif. denied, 177 N.J. 492 (2003). When a defendant is sentenced according to a plea agreement and the reasons for the imposition of a consecutive sentence are self-evident, an explicit assessment of the Yarbough factors is unnecessary. State v. Soto, 385 N.J. Super. 247, 257 (App. Div. 2006); see also State v. S.C., 289 N.J. Super. 61, 70-71 (App. Div. 1996).

Moreover, although the trial court did not expound upon its analysis of the Yarbough factors, its failure to do so will not require re-sentencing because the consecutive sentence is

43

consistent with those guidelines.  See Soto, supra, 385 N.J. Super. at 257.  The imposition of a consecutive sentence was supported by a number of Yarbough factors: Thompson entered guilty pleas to racketeering, conspiracy to commit murder, attempted murder of Logan, murder of Montgomery, conspiracy to commit murder of Stallworth and attempted murder of Stallworth.  The racketeering charge was therefore an offense separate from the other offenses, which involved separate acts of violence or threats of violence, that were committed at different times and places, and the convictions for which the sentences are to be imposed are numerous. See Yarbough, supra, 100 N.J. at 644.

Finally, the imposition of a consecutive sentence on the racketeering conviction was consistent with the legislative intent to "punish separately and by consecutive sentences a defendant convicted of both a RICO conspiracy and a predicate offense." State v. Taccetta, 301 N.J. Super. 227, 259 (App. Div.), certif. denied, 152 N.J. 187 and 152 N.J. 188 (1997).

IX.

The trial court sentenced Holdren to life in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and the Graves Act, N.J.S.A. 2C:43-6, for the murder of Montgomery (count six).  The trial court imposed consecutive terms on the following counts: fifteen years, subject to a parole disqualifier of seven-

and-one-half years, for racketeering (count one) and twenty-five years, subject to NERA and the Graves Act, for the attempted murder of Stallworth (count twenty-one). A concurrent term of twenty-five years, subject to NERA and the Graves Act, was imposed for the attempt to murder Logan (count four). The remaining counts merged. The resulting aggregate sentence was life in prison plus forty years, subject to a ninety-two-and-one-half-year period of parole ineligibility.

Holdren acknowledges "a substantial sentence was warranted" for his convictions, but argues the aggregate sentence of life imprisonment plus forty years, with a parole-ineligibility period of ninety-two-and-one-half years was "unduly punitive, grossly excessive and should be reduced." He has not argued that the trial court erred in finding aggravating factors three, six and nine, N.J.S.A. 2C:44-1(a)(3), (6), and (9), or in failing to find any mitigating factor. He faults the trial court for imposing three consecutive sentences, for imposing a sentence disproportionately harsher than the sentences imposed on Thompson and another co-defendant, McClendon, and for violating the tenets of Miller v. Alabama, 567 U.S. 460, 489, 132 S. Ct. 2455, 2475, 183 L.Ed. 2d 407, 430 (2012), when it failed to give weight to his young age at the time he committed the crime.

A.

We note that Holdren's convictions for the murder of Montgomery and attempted murders of Logan and Stallworth meet five Yarbough factors: (1) the crimes were clearly independent and had as objectives the murders of three different people; (2) the crimes involved separate acts of violence — one murder and two attempted murders; (3) the crimes were committed nearly a month apart in two different counties — the Montgomery/Logan shooting occurred in Monmouth County on November 22, 2006, and the attempted murder of Stallworth occurred in Ocean County on December 28, 2006; (4) the crimes involved three victims — Montgomery, Logan, and Stallworth; and (5) Holdren was sentenced on nine separate convictions. See Yarbough, supra, 100 N.J. at 643-44.

The trial court explicitly addressed the justifications of imposing consecutive versus concurrent sentences, ultimately finding "consecutive sentences [were] appropriate" because Holdren's "crimes and their objectives were predominantly independent of each other," his acts "were separate acts against separate victims" committed at different times and places, he had "three individual victims," he was convicted of "nine separate counts," and he exhibited a "history of antisocial behavior since the age of 12." This analysis represented a fair consideration of the factors set forth in Yarbough, supra, 100 N.J. at 643-44,

46

for determining whether a consecutive sentence is appropriate as well as a cogent statement of reasons for the imposition of consecutive sentences.  See State v. Miller, 108 N.J. 112, 122 (1987).

Furthermore, the imposition of a consecutive sentence on count one, the racketeering conviction, was consistent with the legislative intent underlying New Jersey's RICO statute, N.J.S.A. 2C:41-1 to -6.2, to "punish separately and by consecutive sentences a defendant convicted of both a RICO conspiracy and a predicate offense."  Taccetta, supra, 301 N.J. Super. at 259 (citing State v. Ball, 268 N.J. Super. 72, 145-46 (App. Div. 1993), aff'd, 141 N.J. 142 (1995), cert. denied sub nom. Mocco v. New Jersey, 516 U.S. 1075, 116 S. Ct. 779, 133 L. Ed. 2d 731 (1996)).

### B.

Holdren next argues the disparity between his sentence and the one imposed on co-defendant McClendon requires a more lenient sentence.  We disagree.

A principal goal in reviewing sentences "is the elimination of disparity in order to ensure uniformity and predictability." State v. Palma, 219 N.J. 584, 592 (2014).  Although "[d]isparity may invalidate an otherwise sound and lawful sentence, . . . '[a] sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter.'"  State v.

Roach, 146 <u>N.J.</u> 208, 232 (alteration in original) (quoting <u>State v. Hicks</u>, 54 <u>N.J.</u> 390, 391 (1969)), 519 <u>U.S.</u> 1021, 117 <u>S. Ct.</u> 540, 136 <u>L. Ed.</u> 2d 424 (1996).

In performing a disparate sentencing analysis, the trial court must first "determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria" and "then inquire into the basis of the sentences imposed on the other defendant." <u>Id.</u> at 233. Consideration should be given to "the length, terms, and conditions of the sentence imposed on the co-defendant." <u>Ibid</u>. If the trial court finds the co-defendant to be "sufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the defendant in order to avoid excessive disparity." <u>Ibid</u>.

Holdren contends his culpability is comparable to that of McClendon, who entered a guilty plea to one count of conspiracy to murder Logan and stood trial on unrelated crimes. McClendon received a fifty-five-year sentence subject to NERA; two consecutive sentences, for ten and five years; and a concurrent twenty-year sentence as part of a negotiated plea deal.

The trial court rejected Holdren's argument. It found Holdren and McClendon were "not identical or substantially similar to each other regarding all relevant sentencing criteria" because, unlike

Holdren, McClendon pled guilty to conspiracy to commit murder, was a lower-ranked member of SMM whose subservience to Holdren was demonstrated by his request for help from Holdren and Thompson in retaliating against G-Shine. The court also found it unlikely that McClendon had shot Montgomery or Logan.

These findings, which are supported by the record, show Holdren and McClendon had different levels of culpability in the crimes committed. Further, the fact that McClendon's sentence involved a negotiated plea while Holdren refused the State's plea offer further relieves the trial court of its obligation to treat the two co-defendants uniformly in sentencing. See State v. Gonzalez, 223 N.J. Super. 377, 393 (App. Div.), certif. denied, 111 N.J. 589 (1988) (justifying disparate sentences where one co-defendant cooperated with law enforcement authorities).

Therefore, this was not a case in which the disparity between Holdren's and McClendon's sentences was cause to "invalidate an otherwise sound and lawful sentence." Roach, supra, 146 N.J. at 232.

### C.

Finally, we turn to Holdren's argument that the sentence violated principles articulated by the United States Supreme Court. In Miller, supra, 567 U.S. at 489, 132 S. Ct. at 2475, 183 L. Ed. 2d at 430, the Supreme Court held sentencing schemes that

imposed mandatory sentences of life without parole on juveniles convicted of homicide offenses violated the Eighth Amendment's proscription of cruel and unusual punishment. Miller has no impact on our review of Holdren's sentence because, at eighteen, he was not a juvenile offender, and the sentence imposed was not a mandatory life sentence without the possibility of parole.

Moreover, the trial court did take Holdren's youth into consideration. Although it found no "viable mitigating factors," the court acknowledged Holdren's young age, his "lack of prior indictable criminal activity," and the "excessive hardship" he would experience as a result of "extensive imprisonment." The trial court gave this factor "very little weight," however, "in light of the crimes committed," finding the need for the protection of the public was a significant factor in imposing sentence.

Following our review of all the arguments advanced in light of the record and applicable principles of law, we conclude Holdren's argument that his convictions must be reversed on the basis of cumulative error lacks any merit. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION